Thomas E. ACITO, on behalf of himself and all others similarly situated and Neil Blinderman, Plaintiffs–Appellants,

v.

IMCERA GROUP, INC.; George D. Kennedy; Blakeman M. Ingle; Raymond F. Bentele; and Boyd D. Wainscott, Defendants–Appellees.

No. 367, Docket 94–7149.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1994.

Decided Feb. 1, 1995.

Curtis V. Trinko, New York City (Timothy J. MacFall, Law Offices of Curtis V. Trinko, and Lee Squitieri, Abbey & Ellis, of counsel), for plaintiffs-appellants.

Richard W. Reinthaler, New York City (Cyrus Benson III, White & Case), for defendants-appellees.

Before: OAKES, KEARSE, and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellants Thomas E. Acito and Neil Blinderman, on behalf of themselves and all others similarly situated, appeal from a judgment entered on October 13, 1993 in the United States District Court for the Southern District of New York (Owen, *J.*) granting a motion made by defendants-appellees, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), to dismiss the complaint. The court held that the complaint failed to include the specific factual allegations necessary to make out a claim of securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Plaintiffs also appeal from the denial of their motion to amend the judgment and for leave to amend the pleadings, pursuant to Fed. R.Civ.P. 59(e), entered on January 26, 1994, the court having concluded that the additional allegations did not cure the deficiencies noted in its prior judgment. For the reasons that follow, we affirm.

## BACKGROUND

Plaintiffs-appellants commenced this class action against defendants-appellees IMCERA Group, Inc. ("IMCERA"), its Chairman of the Board of Directors and former CEO, George D. Kennedy, and three of its then-current officers—two of whom were also directors—Blakeman M. Ingle, Raymond F. Bentele and Boyd D. Wainscott. Plaintiff Acito purchased 100 shares of IMCERA stock on December 24, 1991 at $40.50 per share, and plaintiff Blinderman purchased shares of IMCERA stock on February 3, 1992 at $40 per share. Plaintiffs claimed that defendants had misled the investing public by disseminating materially false information and failing to correct prior statements, in violation of Rule 10b–5.

IMCERA, a New York corporation with business operations throughout the world, principally is engaged in three business segments—medical, specialty chemical, and agricultural and animal health products. In 1989, IMCERA's agricultural and animal health products subsidiary, Pitman–Moore ("Pitman"), acquired Coopers Animal Health, Inc. ("Coopers"), which included a manufacturing plant in Kansas City, Kansas. When acquired, the Kansas City plant produced ten animal health care products. As part of the consolidation plan, Pitman submitted applications (known as Supplemental New Animal Drug Applications or "SNADAs") to the Federal Drug Administration ("FDA"), seeking approval for the manufacture of seven additional animal health products at the Kansas City plant. These products already were being produced at other facilities and the Kansas City plant was to be utilized as an alternative production site. The FDA, as part of the application process, inspected the Kansas City plant in 1990. The 1990 inspection revealed thirty-four deficiencies and approval of the SNADAs was delayed pending a reinspection. The FDA reinspected the plant during April–May 1991 and noted fourteen deficiencies. Approval of the SNADAs again was delayed. However, the FDA did not impose any sanctions on Pitman and no other adverse consequences resulted from these two inspections.

In September 1991, IMCERA issued its annual report to shareholders for the period ending June 30, 1991. IMCERA highlighted the progress made in its three subsidiaries. The report represented that Pitman's position in the market was greatly enhanced by the acquisition of Coopers in July 1989 and expressed optimism for the upcoming year. These representations were repeated on IMCERA's Form 10–K, filed with the Securities and Exchange Commission. Further, on September 26, 1991, IMCERA issued a press release stating that management was "comfortable" with analysts' estimates predicting earnings from continued operations of $.85 to $.90 per share for the fiscal quarter ending September 30, 1991. IMCERA also expressed comfort with full-year earning estimates of $5 per share, which was decreased to $1.67 per share due to a three-for-one stock split. At that time, IMCERA announced that its three operating companies, including Pitman, were expected to contribute to the step-up in earnings for fiscal 1992, and the company was bullish on its long-term growth potential.

In October 1991, the company announced that it earned $.89 per share from continued operations for the first quarter, a 22% increase from the first quarter of the previous year. Moreover, IMCERA announced that Pitman posted an increase in earnings of between $1.1 to $1.8 million compared to the previous year. The company again expressed optimism for the 1992 fiscal year.

On December 3, 1991, a spokesperson for IMCERA announced that IMCERA was still comfortable with previous projections of $1.67 per share for the fiscal year, and that "some folks would find some comfort with estimates of about $.33 per share for the second fiscal quarter of 1992 compared with the $.28 per share earned in the year earlier period." On the same day, the FDA began its third inspection of the Kansas City plant. On January 16, 1992, defendant Ingle, then IMCERA's CEO and a director, announced that Pitman's operating earnings for the second quarter were $16 million, an increase of 5% over the previous year, and he again expressed optimism that the company's overall growth would continue.

The following day, January 17, FDA inspector Gwyn Dickinson presented Ronald Berke, Pitman's Director of Operations, with a twenty-page report citing eighty-five manufacturing deficiencies uncovered at the Kansas City plant. On that day, Pitman agreed to suspend production and sales on seven products produced at the Kansas city plant, but failed to notify the investing public of this until February 18, 1992. In the February 18 announcement, IMCERA estimated that it could face an after-tax charge against earnings of up to $.06 per share, but that the actual cost would depend on the duration of the sales suspension and the cost of any corrective actions necessary at the Kansas City plant. The suspension in sales represented less than 2% of Pitman's 1991 sales and less than 1% of IMCERA's total sales. The company also announced that it no longer felt comfortable with analysts' predictions of earnings over $1.65 per share. On February 19, as a result of the suspended sales and IMCERA's new position on projected earnings, IMCERA shares dropped $4.50, or almost 12%, to $34.125.

Plaintiffs alleged in their complaint that IMCERA should have foreseen that the third FDA inspection would have negative consequences, given the deficiencies noted in the first two inspections. Therefore, IMCERA's representations that the company was comfortable with analysts' predictions of earnings of up to $1.67 per share and that the acquisition of Coopers would enhance Pitman were false and misleading. Plaintiffs also alleged that insiders benefitted from their knowledge of this material, adverse information and the false statements concerning IMCERA's future because the inflated share price increased defendants' executive compensation. Plaintiffs further alleged that defendant Kennedy had a motive and opportunity to defraud investors in that, between December 3, 1991 and January 28, 1992, he sold over 380,000 shares, 30,000 of which were sold after the results of the third inspection were known to defendants but before the company notified the public.

Defendants' moved to dismiss the action pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). The court granted the motion, finding that,

because the plant represented a small portion of IMCERA's business and the first two inspections did not result in any adverse action that affected earnings, the results of those two inspections were not material. The court further noted that the first inspection revealed thirty-four deficiencies and the second inspection revealed fourteen, indicating that the plant was on the upswing. Thus, the first two inspections did not give rise to a strong inference that defendants knew that the third inspection would result in adverse consequences. As to the statements expressing comfort with analysts' predictions of earnings and predicting that the acquisition of Coopers would enhance Pitman, the court found that these claims were based solely on hindsight. Lastly, the court determined that there were no facts to provide a strong inference of intent to defraud the investing public.

Plaintiffs subsequently moved for leave to amend their complaint to cure the deficiencies. The court reviewed the new matter to be included in the amended complaint and denied the motion, ruling that the new information was insufficient to cure the original complaint. This appeal followed.

## DISCUSSION

■ In reviewing the district court's dismissal of an action pursuant to Fed.R.Civ.P. 12(b)(6), we accept the facts alleged in the complaint as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "Generally, we will uphold a district court's dismissal of a claim only if it appears that the plaintiff can prove no set of facts upon which relief may be granted." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994). When the complaint contains allegations of fraud, however, Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." We have stated that "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

Rule 9(b) also states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Because Rule 9(b) is intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit," *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991), we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a "license to base claims of fraud on speculation and conclusory allegations," *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). Accordingly, plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. *Shields*, 25 F.3d at 1128; *accord Mills*, 12 F.3d at 1176; *O'Brien*, 936 F.2d at 676; *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128.

"To state a cause of action under Rule 10b–5, a plaintiff must plead that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). In this case, the bulk of plaintiffs' securities fraud allegations are premised on their assertion that the reports of the first two FDA inspections constituted material information. From this premise, plaintiffs assert that: (1) the reports of the first two inspections should have been disclosed to the investing public; (2) the results of the first two inspections put defendants on notice that the third inspection inevitably would result in negative consequences;

and (3) the failure to disclose the results of the first two inspections as well as the "inevitable consequences" of the third inspection rendered defendants' positive statements concerning Pitman's future earnings potential and Coopers' effect on Pitman false and misleading.

Accordingly, the threshold issue for the bulk of plaintiffs' claims is whether the reports of the first two inspections constituted material information. However, even if the reports of the first two inspections are not considered material information, plaintiffs' remaining claim—that the delay in notifying the investing public of the results of the third inspection was a material omission of information—requires further analysis. It therefore is necessary to examine the reports of the first two inspections in relation to their effect on defendants' statements to the public, as well as the effects of the delay in disclosing the results of the third inspection.

### 1. The FDA Inspections

Plaintiffs claim that the results of the first two inspections constituted material information and should have been disclosed to the investing public. We disagree. Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In this case, the Kansas City plant was one of over thirty IMCERA business locations and produced only ten of the 1000 products manufactured by IMCERA. Further, no materially adverse action was taken by the FDA as a result of the first two inspections, and Pitman had made commitments to the FDA to correct the plant deficiencies. The number of deficiencies was reduced from thirty-four in the first inspection to fourteen in the second, indicating that the plant was improving. These reports therefore were not material to the average investor. Moreover, IMCERA is a worldwide company engaged in heavily regulated businesses that produce over a thousand products in over thirty countries. It would

be unduly burdensome and impractical to publicly disseminate the results of every inspection of every plant.

■ Plaintiffs also contend that the first two inspections put defendants on notice that a third inspection would result in negative consequences. Plaintiffs rely on the February 18 notice that Pitman was going to suspend production at the Kansas City plant for thirty days and that IMCERA was no longer comfortable with analysts' projections of earnings over $1.65 per share. From this announcement, plaintiffs allege that the results of the third inspection should have been publicly disclosed as far back as September 1991. This contention is without merit.

■ Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978); *see DiLeo v. Ernst & Young*, 901 F.2d 624, 627–28 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Moreover, conclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b), *see Wexner*, 902 F.2d at 172, and defendants' lack of clairvoyance simply does not constitute securities fraud, *see Denny*, 576 F.2d at 470 (holding that defendant's failure to anticipate future events did not constitute securities fraud).

■ Here, the third inspection was inevitable because Pitman still had applications pending at the FDA. However, one cannot infer that it was a "foregone conclusion" that the Kansas City plant would fail the inspection and adverse consequences would ensue. The first inspection noted thirty-four deficiencies. Pitman assured the FDA that it would correct those deficiencies. In the second inspection, the FDA noted fourteen deficiencies, indicating that the plant was improving. While the third inspection revealed numerous deficiencies, the complaint, at most, alleges mismanagement of the plant. It is well settled "that section 10(b) was not designed to regulate corporate mismanagement." *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982). Therefore, these allegations fail to state a securities fraud claim with particularity.

Because we find that information regarding the first two FDA inspections is not material, plaintiffs' claim that IMCERA's positive representations concerning earnings were false and misleading also fails. While plaintiffs satisfied Rule 9(b)'s pleading requirements in that the allegations specified the statements, identified the speaker, and stated when and where the statements were made, the complaint fails to explain in what respects the statements were false or misleading. *See Mills*, 12 F.3d at 1175.

## 2. The Delay in Disclosure

As the district court noted, "stripped of its veneer … plaintiffs['] claim … boils down to the fact that [IMCERA] should have told the investing public earlier than February 18, 1992, the date of the negative press release, that the Kansas City plant was not coming on line." Because the complaint includes allegations that Pitman learned the results of the third inspection and agreed to suspend production on January 17, 1992, and because the statements up to that point were not false or misleading, the issue becomes whether the delay in notifying the public between January 17 and February 18 provides the basis for a claim of securities fraud. Although these allegations satisfy Rule 9(b)'s particularity requirement, our inquiry does not end there.

■ Plaintiffs must also allege facts that give rise to a strong inference of scienter as well. "Scienter is a necessary element of every 10b–5 action, and though it need not be plead with 'great specificity,' the facts alleged in the complaint must 'give rise to a "strong inference" of fraudulent intent.' " *Time Warner*, 9 F.3d at 268 (quoting *O'Brien*, 936 F.2d at 676) (internal citations omitted). Plaintiffs may plead scienter by alleging "facts establishing a motive to commit fraud and an opportunity to do so," or alleging "facts constituting circumstantial evidence of either reckless or conscious misbehavior." *Id.* at 268–69. In light of our previous analysis, plaintiffs clearly have failed to allege facts constituting circumstantial evidence of reckless or conscious misbehavior.

Plaintiffs attempt to establish a motive and opportunity by alleging that: (1) all defendant officers of IMCERA were motivated to inflate the value of IMCERA stock because the increase in stock price had a direct effect on their executive compensation; (2) defendant Kennedy was motivated because he stood to benefit from the inflated value of IMCERA stock when he sold 384,000 shares in December and January; and (3) defendant Kennedy directly benefitted from the delay because he sold 30,000 of his shares on January 28, 1992. Each claim will be discussed in turn.

 Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1107 (D.Conn.1991); *accord Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068–69 (5th Cir.1994). Therefore, we hold that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.

 As to the allegations concerning defendant Kennedy, we find that, in the context of this case, the sale of stock by one outside director does not give rise to a strong inference of an intent to deceive the investing public. The complaint acknowledges that Kennedy had retired in October 1991 as an officer of IMCERA and thus was an outside director during most of the class period. Moreover, defendant Kennedy notified IMCERA, which in turn notified the investing public on November 14, 1991, that Kennedy planned to exercise options on 354,000 shares, that he had 93,000 unexercisable options, and that he planned to retain 192,000 shares because he was confident about IMCERA's future. Between December 17, 1991 and January 8, 1992 Kennedy exercised his options and sold approximately 350,000 shares in accordance with the November 14 announcement. These sales occurred before the FDA disclosed the results of the third inspection, and fail to provide any inference of an intent to deceive the public.

 Lastly, plaintiffs rely on the additional 30,000 shares that Kennedy sold on January 28. Plaintiffs allege that IMCERA delayed the negative press release to give defendant Kennedy the opportunity to sell his shares before the stock plummeted. While unusual insider trading activity during the class period may permit an inference of bad faith and scienter, *see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990), plaintiffs have failed to establish that Kennedy's stock sales were "unusual."

As discussed above, Kennedy disclosed all his holdings in the November announcement. The additional 30,000 shares that Kennedy sold in January represented less than 11% of his holdings; after the sale, Kennedy owned approximately 259,000 shares and/or options of IMCERA stock. Further, the complaint failed to allege that any other defendant sold any shares of IMCERA stock during this period. The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public "so that they could sell their stock at a huge profit." *In re Cypress Semiconductor Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 97,060, at 94,-697, 1992 WL 394927 (N.D.Cal.1992) (holding that plaintiffs' claims that defendants artificially inflated the company's share price so that they could sell their stock at a huge profit was undermined by the fact that one of the four defendants did not sell his stock during the class period). Moreover, it appears that the 30,000 shares were actually stock options that became exercisable subsequent to the November announcement. Therefore, we find that the facts alleged in the complaint did not give rise to a "strong inference" of intent to deceive.

*3. The Motion for Leave To Amend the Complaint*

 Plaintiffs claim that the district court abused its discretion in denying their

Rule 59(e) motion to amend the judgment and grant plaintiffs leave to amend their complaint. Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b). Fed. R.Civ.P. 15(a); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). Although the decision of whether to allow plaintiffs to amend their complaint is left to the sound discretion of the district court, there must be good reason to deny the motion. *See S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979). One good reason to deny leave to amend is when such leave would be futile. *Id.* The district court in this case examined plaintiffs' supplementary allegations and determined that the additional information did not cure the complaint. We agree.

Plaintiffs attempt to support their contention that the first two FDA inspections were material by alleging in their proposed amended complaint that at the end of each inspection, the FDA inspector warned Pitman management of the potential penalties it would face if the plant failed future inspections. These warnings do not support an inference that Pitman management believed that the plant would suffer any of those penalties. The record indicates that Pitman management knew that the FDA would conduct a reinspection and assured the FDA that the deficiencies noted in the first inspection would be corrected. Although the FDA report for the second inspection noted that not all of the corrective steps had been completed or satisfactorily completed, Pitman clearly was attempting to correct the plant's deficiencies, and mismanagement alone does not constitute fraud. *Decker,* 681 F.2d at 115.

Plaintiffs also claim in their proposed amended complaint that IMCERA's earnings of $1.65 per share for fiscal year 1992 were accomplished through accounting manipulations, without which the company only would have earned $1.47 per share. This allegation is not helpful to plaintiffs. Given that the information regarding the first two FDA inspections was not material and the results of the third inspection not foresee-able, IMCERA's actual earnings for fiscal 1992 cannot cure these pleading deficiencies.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.