SLOANE OVERSEAS FUND, LTD.,
Brompton Partners L.P., and
Susan Roeder, Plaintiffs,

v.

SAPIENS INTERNATIONAL CORPORA-
TION, N.V., Swiss Bank Corporation, and
Deloitte & Touche, L.L.P., Defendants.

No. 95 Civ. 9165 (RPP).

United States District Court,
S.D. New York.

Sept. 23, 1996.

Herzfeld & Rubin, P.C. by John M. Schwartz, New York City, for Plaintiffs.

Skadden, Arps, Slate, Meagher & Flom by Seth M. Schwartz, Michael P. Lowman, New York City, for Defendant Sapiens International Corporation, N.V.

Cleary, Gottlieb, Steen & Hamilton by William M. Hohengarten, Richard F. Ziegler, New York City, for Defendant Swiss Bank Corporation.

Deloitte & Touche, L.L.P. by David Wagner, New York City, for Defendant Deloitte & Touche, L.L.P.

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs Sloane Overseas Fund, Ltd. ("Sloane"), Brompton Partners L.P. ("Brompton"), and Susan Roeder ("Roeder") filed a complaint alleging that (1) defendants Sapiens International Corporation, N.V. ("Sapiens"), Swiss Bank Corporation ("SB"), and Deloitte and Touche L.L.P. ("D & T") violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("the 1934 Act") along with Rule 10b–5 of the Securities and Exchange Commission ("SEC"); (2) defendants Sapiens and SB violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("the 1933 Act"); (3) defendant SB violated § 20(a) of the 1934 Act and § 15 of the 1933 Act; and (4) all three defendants engaged in common law fraud, deceit, or negligent misrepresentation.

Defendant Sapiens moves pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") to dismiss the entire complaint for lack of subject matter jurisdiction; to dismiss all plaintiffs' federal claims as barred by the statute of limitations[1]; and to dismiss the § 12(2) claim pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim in light of the Supreme Court's recent decision in *Gustafson v. Alloyd Co.,* —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Defendant SB joins Sapiens' motion in its entirety; moves to dismiss the § 10(b) claim pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) for failure to plead facts constituting fraud; and moves to dismiss the § 15 and § 20(a) claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to plead facts necessary to infer control person status. Defendant D & T joins those portions of Sapiens' motions pertaining to subject matter jurisdiction and statute of limitations and also moves pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b) to dismiss the § 10(b) claim for failure to plead facts constituting fraud.

### BACKGROUND

Defendant Sapiens is a Netherlands Antilles corporation with its principal office located in Curacao, Netherlands Antilles. (Complaint dated Oct. 25, 1995 ("Complaint") ¶ 8.) Sapiens common stock has been publicly traded since June 1992. (*Id.* ¶ 11.) In September 1993, Sapiens sold $50 million worth of debt securities due in 2003 convertible into Sapiens common stock ("the Notes"). (*Id.* ¶ 12.) The offering was made pursuant to an Offering Circular which stated that the Notes could be sold either (1) outside the United States pursuant to an exemption from registration under Regulation S or (2) to qualified institutional buyers in the United States pursuant to an exemption under Rule 144A. (Declaration of Michael Hammond sworn to on Feb. 21, 1996 ("Hammond Decl."), Ex. A at 63.) SB was the lead manager of the offering. (Complaint ¶ 13.) D & T audited the financial statements for the fiscal year ending December 31, 1992 in the Offering Circular. (*Id.* ¶ 19.) The Offering Circular also contained unaudited figures for the six months ending June 30, 1993. (*Id.*)

Plaintiff Sloane is a corporation organized under the laws of the British Virgin Islands, where it maintains its principal place of business. (*Id.* ¶ 5.) Plaintiff Brompton is a Delaware Limited Partnership. (*Id.* ¶ 6.) Plaintiff Roeder is a United States citizen who resides in England. (*Id.* ¶ 7.) Plaintiffs allege that in September 1993 they purchased from defendant SB a total of $750,000 face amount of the Notes in reliance on the Offering Circular. (*Id.* ¶ 29.)

On October 25, 1995, plaintiffs commenced this action. They allege that numerous misrepresentations and omissions in the Offering

---

1. If all the federal claims are dismissed, then the state claims may, in the Court's discretion, be dismissed for want of supplemental jurisdiction. 28 U.S.C. § 1367(c)(3).

Circular and elsewhere caused them to "suffer[ ] damages in the amounts of their respective investments in connection with their purchases of the Notes." (*Id.* ¶ 53.)

## DISCUSSION

### I. *The Motion to Dismiss the Complaint for Lack of Subject Matter Jurisdiction.*

All defendants move pursuant to Fed. R.Civ.P. 12(b)(1) to dismiss the complaint for lack of subject matter jurisdiction. They contend that Sapiens' debt offering was an extraterritorial offering which occurred outside the United States and was offered only to citizens of countries other than the United States, (Memorandum of Law of Defendant Sapiens International Corporation, N.V. in Support of its Motion to Dismiss the Complaint ("Sapiens Mem.") at 2), and is therefore not subject to the 1933 Act or the 1934 Act.

As a preliminary matter, the parties dispute whether the plaintiffs had notice that they were required to provide a participation certificate in order to purchase the Notes. Defendant SB offers affidavits and documentary evidence tending to show that participation certificates were required of all purchasers of the Notes pursuant to a Fiscal Agency Agreement, and that these certificates required a representation that the purchaser was in compliance with the exemption from registration requirements under either Rule 144A or Regulation S. (*See, e.g.,* Hammond Decl.Ex. A at 63; Declaration of Janet Robinson sworn to on June 19, 1996 ("Robinson Decl.") ¶ 2.) The Declarations tend to show that plaintiffs must have had notice from the transfer agents and clearing agents that they were required to submit a participation certificate because the transfer agent had certified that the purchasers had delivered certificates confirming compliance with Regulation S. (Robinson Decl. ¶ 3.)

Plaintiffs maintain that their purchases were made without notice of any such restrictions. With the Declaration of Thomas Roeder sworn to on June 5, 1996 ("Roeder Decl."), plaintiffs have established, solely for purposes of this motion, that plaintiffs evidently purchased the Notes without notice that a participation certificate was required.[2]

Defendants contend that, pursuant to the Supreme Court's decision in *E.E.O.C. v. Arabian American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (hereinafter "*Aramco*"), the 1933 Act and the 1934 Act do not apply to extraterritorial offerings of securities. (Sapiens Mem. at 8.) In *Aramco,* the Court interpreted Title VII of the Civil Rights Act of 1964 and laid out guidelines for when a statute may be construed to apply to extraterritorial activities. The Court stated that unless "the affirmative intention of the Congress [is] clearly expressed, we must presume [a statute] is primarily concerned with domestic conditions." *Id.* at 248, 111 S.Ct. at 1230 (internal citations omitted). The Court further explained that, given the presumption against extraterritoriality, clear evidence that Congress intended to apply a statute extraterritorially is needed. *Id.* at 258, 111 S.Ct. at 1235. Mere boilerplate recitations will not do. *Id.* at 250–51, 111 S.Ct. at 1231–32.

Applying the reasoning in *Aramco* to this case, jurisdiction would not exist over these claims because the 1933 Act and the 1934 Act do not clearly apply to extraterritorial transactions. There is no clear evidence that Congress intended these statutes to apply to overseas transactions. *See Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121 (2d Cir.1995) ("It is well recognized that the Securities Exchange Act is silent as to its extraterritorial application"), *cert. denied,* — U.S. —, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). Accordingly, under the *Aramco* standard, defendants' assertion that the overseas offering in this case is not subject to the 1933 Act or

**2.** Under Rule 12(b)(1) of the Fed.R.Civ.P., the plaintiff need only make a prima facie showing of subject matter jurisdiction at this stage of the proceedings. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). Defendants assert in oral argument, however, that plaintiffs' participation certificates, if any, are in the hands of their Luxembourg agent and cannot be released without plaintiffs' authorization. (Transcript of Hearing held June 27, 1996 ("Tr.") at 58–59.) Accordingly, plaintiffs are required to give the defendants authorization to obtain the release of any said certificates within 10 days of the filing of this opinion and order.

the 1934 Act would appear to be correct, and the complaint would be dismissed pursuant to Rule 12(b)(1) of the Fed.R.Civ.P.

■ In this Circuit, however, *Aramco* has never been applied to the 1933 Act or the 1934 Act. Instead, the Second Circuit has applied the "conduct" and "effects" test enunciated in *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). Under the "conduct" and "effects" test, there is jurisdiction over an overseas offering (a) if "the defendant's conduct in the United States was more than merely preparatory to the fraud" and these actions caused the claimed losses, or (b) "where illegal activity abroad causes a 'substantial effect' within the United States." *Id.* Chief Judge Friendly stated the rationale for this extraterritorial jurisdiction, writing, "[t]he New Yorker who is the object of fraudulent misrepresentations in New York is as much injured if the securities are of a mine in Saskatchewan as in Nevada." *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1336 (2d Cir.1972).[3] Since in *Itoba,* 54 F.3d at 121–22, the Second Circuit applied this test in 1995, four years after *Aramco,* there is no clear guidance that the test in *Leasco* is now inapplicable. Accordingly, the conduct and effects test utilized by the Second Circuit will be applied.

■ Here, plaintiffs have established jurisdiction under the "effects" prong of the Second Circuit's "conduct" and "effects" test, and therefore the "conduct" prong need not be analyzed. *See, e.g., Alfadda,* 935 F.2d at 478–480 (finding jurisdiction based on "conduct" prong alone.) Brompton, a Delaware Partnership, alleges it purchased notes in the offering.[4] (Complaint ¶ 29.) This allegation weighs in favor of jurisdiction under the "effects" test. *See Schoenbaum v. Firstbrook,* 405 F.2d 200, 206 (2d Cir.1968) (the 1934 Act "reaches beyond the territorial limits of the United States and applies when a violation of

the Rules is injurious to United States investors"), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

Additionally, plaintiffs contend the "effects" test is satisfied because Sapiens had issued common stock traded in the United States. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Pls.Mem.") at 18.) Plaintiffs rely on *Itoba,* where the securities traded in the United States were derivative securities bearing a direct relationship to the overseas security. *Itoba,* 54 F.3d at 123. Here, the overseas security was part of a debt offering convertible to common shares which traded on NASDAQ. (Hammond Decl., Ex. A at 5.) This relationship, while not a "direct linkage," does demonstrate that the alleged fraud in the Offering Circular could "impact[ ] detrimentally upon ... United States shareholders in the defrauded company" and, in conjunction with the allegations above, satisfies the effects test. *Id.* at 123, 124.

For the reasons stated above, plaintiffs have made a prima facie showing of subject matter jurisdiction under the effects prong of the "conduct" and "effects" test, and their claims can be considered on their merits.

II. *The Motion to Dismiss the Complaint as Barred by the Statute of Limitations.*

■ Defendants contend that plaintiffs failed to bring their § 12(2) and § 10(b) claims within the time period provided by the 1933 and 1934 Acts, and that such claims are therefore barred by the statute of limitations. Under these Acts, claims must be brought "within one year of the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111

---

**3.** Another justification for extraterritorial jurisdiction is that "Congress [did not] intend[ ] to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017 (2d Cir.1975).

**4.** As discussed *supra,* plaintiffs have put forth prima facie evidence that they purchased the Notes without notice that a participation certificate was required. Therefore, for purposes of this motion to dismiss, plaintiffs are not deemed to have purchased the notes in violation of the terms of the offering.

S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) (applying this standard to § 10(b) and Rule 10b–5 of the 1934 Act); *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.), *cert. denied,* 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992) (standard applies to both the 1933 and 1934 Acts).[5] This standard is often referred to as "inquiry notice." (Sapiens Mem. at 15.) Inquiry notice occurs when the misrepresentation or omission "reasonably should have been discovered." *Menowitz v. Brown,* 991 F.2d 36, 42 (2d Cir. 1993) (internal citation omitted). Such a point occurs "where the circumstances are such to suggest to a person of ordinary intelligence the probability that he has been defrauded." *In re Ames Dept. Stores, Inc. Note Litigation,* 991 F.2d 968, 979 (2d Cir. 1993).

Plaintiffs commenced this action on October 25, 1995. They claim they were put on notice, at the earliest, on October 26, 1994, when Sapiens issued a press release stating that they would review transactions that were included in the financial statements in the Offering Circular. (Pls.Mem. at 6.)

Defendants assert that plaintiffs were put on inquiry notice on August 15, 1994 at the latest, when a consolidated and amended class action complaint was filed by certain common stockholders alleging that Sapiens had made false projections of future earnings.[6] (Affidavit of Seth Schwartz sworn to on February 23, 1996 ("Schwartz Aff."), Ex. A (the "Class Complaint").) Plaintiffs contend that the Class Complaint did not put them on inquiry notice because the misrepresentations and omissions that the shareholder plaintiffs alleged there involved the class period of February 7, 1994 through May 4, 1994, whereas plaintiffs' complaint here is based on misrepresentations and omissions in the Offering Circular, which attached financial statements for the year ending December 31, 1992 and for the first half of 1993. (Complaint ¶¶ 16–30.)[7]

Defendants reply that, despite the difference in dates, the shareholder class actions were sufficient to put plaintiffs on inquiry notice because there was a "common thread" between the shareholder and instant actions: both alleged that sham sales of software licenses were reported on their financial statements. (Class Complaint ¶ 48(e); Complaint ¶¶ 20–21.).

■ The filing of a class action suit by common stockholders does not, as a matter of law, put noteholders on inquiry notice as to their own claims. *Ames,* 991 F.2d at 981. In *Ames,* for example, there was no inquiry notice because, "the factual claims made in the noteholders' complaint are … more complex than those made in the initial stockholders' complaint." *Id.* at 980. However, if the prior lawsuits "specifically concerned the very misrepresentations alleged in the [present] complaint[ ]," then the prior lawsuits constitute inquiry notice. *Menowitz,* 991 F.2d at 42.[8]

■ In this case, the shareholder class actions were considerably more detailed than they were in *Ames,* and thus more likely to put the plaintiffs on notice as to the violations that occurred. The Class Complaint does not put plaintiffs on sufficient notice because the Class Complaint alleged misrepresentations during 1994 which artificially inflated the price of Sapiens' common stock.

---

**5.** The claims must also be brought within three years after the violation occurred. 15 U.S.C. § 77m; *Lampf,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991).

**6.** Sapiens' earlier May 1994 announcement that earnings would not meet expectations and a July 1994 announcement that earnings for the quarter ending March 31, 1994 would be restated are not sufficient to trigger inquiry notice. Not only are these announcements unrelated to the time period at issue in the Offering Circular, but also they provided no reason for a reasonable investor to believe that Sapiens violated the 1933 Act or the 1934 Act in the Notes offering.

**7.** Plaintiffs' complaint also alleges continuing misrepresentations and omissions after the distribution of the Offering Circular. (Complaint ¶¶ 31–38.) These allegations, however, are only relevant because they "delayed the access of plaintiffs to the truth" about the misrepresentations and omissions in the Offering Circular. (Complaint ¶ 31.)

**8.** The fact that the Notes here were convertible into common shares is not of significance because the Class Complaint only concerned persons who had purchased or sold common shares during the class period (February 7, 1994 to May 4, 1994).

These alleged misrepresentations occurred well after the time period relevant to plaintiffs' complaint.

The Class Complaint does contain undated allegations of "sham transactions" with C3, Inc. ("C3"). (Class Complaint ¶ 48(e).) These allegations, however, do not constitute inquiry notice because nowhere in the Offering Circular for the Notes is there any mention of transactions with C3. (Hammond Decl., Ex. A.) Since the Class Complaint does not state that these sham transactions occurred in a period prior to the distribution of the Offering Circular, the Class Complaint could not have alerted plaintiffs to "the probability that [they have] been defrauded" by the Offering Circular. *Ames,* 991 F.2d at 979. Under these circumstances, it is not "clear on the face of the complaint that a duty of inquiry arose in the period barred by the statute of limitations," and the motion to dismiss the federal claims on these grounds is denied. *Henkind v. Brauser,* 1989 WL 54109, *7 (S.D.N.Y.).

III. *Defendants' Motion to Dismiss the Section 12(2) Claim.*

Defendants contend that since the Note offering by Sapiens was made without a prospectus as permitted by Regulation S, the sellers of the offering are not subject to liability under § 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2), as charged in Count II of the complaint. Citing *Gustafson v. Alloyd Co.,* —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), defendants argue that § 12(2) of the 1933 Act applies only to offerings under § 10 of the 1933 Act, 15 U.S.C. § 77j, made by a prospectus containing the information in the registration statement as required by § 5 of the 1933 Act, 75 U.S.C. § 77e. *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1067. Since Regulation S offerings

do not require a § 10 prospectus to be filed, defendants argue, the offering is not subject to suit under § 12(2). (Sapiens Mem. at 23.)

In *Gustafson,* the Court states that § 12(2) only applies to offerings made with a § 10 prospectus, unless the offering is subject to an overriding exemption. *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1067. The Court points out that "[w]hen the 1933 Act was drawn and adopted, the term 'prospectus' was well understood to refer to a document soliciting the public to acquire securities from the issuer." *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1070. Therefore, the Court found that, for § 12(2) purposes, "the term 'prospectus' relates to public offerings by issuers and their controlling shareholders." *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1070.[9]

In so defining the term "prospectus," the Court effectively limited § 12(2) claims to all public offerings subject to the registration and prospectus requirements of § 10, which exempts securities issued pursuant to § 3 and transactions pursuant to § 4. *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1067 ("a prospectus under § 10 is confined to documents related to public offerings"). *See also id.* at —— —— ——, 115 S.Ct. at 1073–74 ("the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder.")[10]

■ Regulation S offerings are not exempted pursuant to § 3 or § 4 of the 1933 Act, 15 U.S.C. § 77c. Therefore, given the Supreme Court's intention that a § 12(2) cause of action apply to public offerings, an offering issued pursuant to Regulation S is subject to liability under § 12(2) if it is a public offering. In this case, the wide distribution of the Offering Circular made Sapiens' Note offering public.[11] Therefore, § 12(2) of

---

9. *See, e.g., In re JWP Inc., Securities Litigation,* 928 F.Supp. 1239, 1259 (S.D.N.Y.) ("[i]n *Gustafson,* the Supreme Court recently held that the term 'prospectus' refers to a 'document that describes a public offering of securities' "); *Glamorgan Coal Corp. v. Ratner's Group PLC,.* 1995 WL 406167, *2 (S.D.N.Y.) ("[e]very court since *Gustafson,* including this district, has held in light of *Gustafson,* that § 12(2) applies only to initial public offerings.")

10. *Gustafson* in fact, only held "that the right of rescission [under § 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2) ]" did not "extend[ ] to a private secondary transaction." *Gustafson,* —— U.S. at ——, 115 S.Ct. at 1064.

11. Regulation S allows offerors to escape the from the registration requirements of § 5 of the 1933 Act. 17 C.F.R. § 230.901. The regulation is intended for use in public offerings. Private transactions are already exempt under § 4(2) of

the 1933 Act governs the conditions of sale of the Note offering, and the motion to dismiss on that ground is denied.

### IV. Defendant SB's Motion to Dismiss the Section 10(b) and Rule 10b–5 Claims.

■ Defendant SB contends that the complaint fails to plead facts demonstrating that SB acted with the scienter required to state a claim under § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder. A claim under § 10 and Rule 10b–5 must be pleaded in accordance with Rule 9(b) of the Fed.R.Civ.P. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

■ Scienter as required by Rule 9(b) may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Shields*, 25 F.3d at 1128. Plaintiffs' complaint does not satisfy either of these conditions.

■ In attempting to demonstrate sufficient motive to prove scienter, plaintiffs claim that since SB "was a founder, a substantial creditor, and a shareholder of Sapiens," (Pls.Mem. at 46 (citing Complaint ¶ 9)), and since SB was also the lead manager and underwriter of the offering, SB had "ample motive to inflate Sapiens' financial soundness to ensure a successful and profitable offering." (Pls.Mem. at 47.) Generic allegations of financial interest are inadequate to prove scienter in Rule 10b–5 cases. *Acito*, 47 F.3d at 54 (rejecting claim of scienter based on defendants' incentive compensation bearing relation to issuing corporation's stock price). The facts alleged by plaintiffs are not sufficient to show motive and opportunity of SB to allow false statements to be made in

the financial statements contained in a public offering of convertible notes.

As stated in *In re Crazy Eddie Securities Litigation*, 817 F.Supp. 306 (E.D.N.Y.1993), "short of conducting a financial audit, which plaintiffs do not contend Underwriters should have done, the Underwriters were not in a position to discover any of the fraudulent schemes which caused injury to plaintiffs." *In re Crazy Eddie Securities Litigation*, 817 F.Supp. at 316.

■ Plaintiffs argue that the "circumstantial evidence" prong of the test for scienter is satisfied by "the very facts cited above that prove that SB had both motive and opportunity to perpetrate this fraud." (Pls.Mem. at 48.) Under Second Circuit precedent, a complainant attempting to plead scienter adequately under this prong must "allege facts that give rise to a strong inference of fraudulent intent." *Acito*, 47 F.3d at 52; *Shields*, 25 F.3d at 1128; *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991); *see also* Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, §§ 101–02, 109 Stat. 737, 747 (1995) (codifying Second Circuit standard for pleading scienter). Under this standard, a finding of scienter for a defendant who simply has the aforementioned roles in the issuing company is insufficient to infer fraudulent intent. Plaintiffs have not pleaded adequate facts to demonstrate "circumstantial evidence of either reckless or conscious misbehavior" on the part of SB. *Acito*, 47 F.3d at 53; *Shields*, 25 F.3d at 1128. Their § 10(b) claim against SB is hereby dismissed pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b).

### V. Defendant SB's Motion to Dismiss the Controlling Person Claims.

SB moves pursuant to Rule 12(b)(6) of the Fed.R.Civ.P. to dismiss plaintiffs' claim pursuant to § 20(a) of the 1934 Act and § 15 of the 1933 Act that it was "in a position to

---

the 1933 Act. 15 U.S.C. § 77d(2). Defendants have not contended that the Note offering was private, or was only made to people who do not "need[] the protection of the Act." *SEC v. Ral-*

*ston–Purina Co.*, 346 U.S. 119, 125, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953) (explaining difference between public and private offerings).

influence Sapiens and was a controlling person." (Complaint ¶ 49.) The SEC defines a control person as one having "the possession, direct[ly] or indirect[ly], of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities or otherwise." 17 C.F.R. § 240.12b–2 (for 1934 Act); 17 C.F.R. § 230.405 (for 1933 Act).

■ In order to sustain such a motion at the pleading stage, a plaintiff must plead facts which "support a reasonable inference that they had the potential power to influence and direct the activities of the primary violator." *Food and Allied Service Trades Dept., AFL–CIO v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 591 (S.D.N.Y.1990).

In *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir.1973), the court stated that the intent of Section 20 was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons. *Lanza,* 479 F.2d at 1299. A number of subsequent opinions led by *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 *cert. denied* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), have since held that neither scienter nor culpable participation is required to state a claim for Section 20 liability. *See, e.g., Food & Allied Service Trades Dept.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994); *Borden, Inc.,* 735 F.Supp. 587 (S.D.N.Y.1990).

■ *Marbury Management* was a case in which liability was premised on a respondeat superior theory which is very similar to an agency theory and held that Section 20(a) did not preclude control liability on that theory. *Marbury Management,* 629 F.2d at 712–713. In *Borden Inc.* control liability was premised on 100% stock ownership. *Borden, Inc.,* 735 F.Supp. at 591. As *Lanza* points out, liability based on stock ownership or agency existed in the 1933 Act prior to the passage of Section 20(a). *Lanza,* 479 F.2d at 1298 n. 63. A review of the precedents leads this Court to conclude that pleading respondeat superior, an agency relationship, substantial stock ownership, or officer/director status from

which control can be directly inferred without more, provides a sufficient basis to show control liability. However, if plaintiff seeks to attribute control status to a third party, director, or employee who is not in a control position nor an outside party such as an attorney, auditor or underwriter, then further factual allegations must be made to show that in fact such control can be inferred.

■ Director status alone does not establish control person liability. *In re Par Pharmaceutical, Inc. Securities Litigation,* 733 F.Supp. 668 (S.D.N.Y.1990). "A person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20." *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988); *cf. Gray v. First Winthrop Corp.,* 776 F.Supp. 504 (N.D.Cal.1991) (lender's status as major lender or standard terms of loan agreement are insufficient to establish controlling person liability); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir. 1986) (neither law firm nor accounting firm which rendered services to corporation which sold bonds and notes in violation of federal securities law had ability to control corporation); *Morse v. Weingarten,* 777 F.Supp. 312, 318 (S.D.N.Y.1991) (allegations that underwriter exercised control over corporation's investments fail to state a claim for control person liability absent allegations identifying any position or title that underwriter held at corporation or any meetings which underwriter attended or conversations which he had with any of the corporation's officers).

■ Accordingly, when a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred, e.g., that defendant had power, pursuant to an agreement to control the primary violator or aided the primary violator in performing some culpable conduct linking the defendant to the primary violation for which relief is sought. For instance, in *Food and Allied Service Trades Dept.,* the control person claims as against director defendants other than Peizer were not dismissed. *Food and Allied Service Trades Dept.,* 841 F.Supp. at 1391. The defendants in that case were

long time vice-presidents of Sales, Operations, and Finance as well as directors of Millfeld Trading, Inc., the primary violator. Peizer was not an officer, but was a director for eight months. He was also a substantial holder of Millfeld Trading's convertible debentures and divested himself of 90% of his substantial holdings of common stock the day before the public announcement of Millfeld Trading's wrongdoing. *Id.* Even so, the court held that since Peizer was not alleged 1) to have held a controlling block of stock, 2) to have been involved in Millfeld Trading's day to day operation, or 3) to have had had anything to do with the preparations of Millfeld Trading's public statements during the relevant period, controlling person status was not shown. The court found that it could not infer from the sale of stock that Peizer had long standing knowledge and control of Millfeld Trading as opposed to inside knowledge of the public announcements to be made the next day. The § 20(a) claim against Peizer was dismissed. *Food & Allied Service Trades Dept.,* 841 F.Supp. at 1392.

■ Here, plaintiffs allege that (1) SB was a founder of Sapiens, (2) SB was a creditor of Sapiens at the time of its formation, (3) SB owned 8% of Sapiens' shares, (4) SB had a Vice President on Sapiens' board of directors, and (5) SB was the underwriter for the Notes offering. (Complaint ¶¶ 9, 12–15.) The Offering Circular shows that the officers and directors as a group owned 34.5% of the outstanding common stock of Sapiens and that SB was not a controlling stockholder of Sapiens. Accordingly, SB's 8% holding together with the other facts alleged do not meet the standard for control person status on the part of SB. For the purposes of this motion to dismiss, the facts alleged do not "support a reasonable inference that [SB] had the potential power to influence and direct the activities of" Sapiens. *Food and Allied Service Trades Dept.,* 841 F.Supp. at 1391.

For the forgoing reasons, SB's motion to dismiss the control person claims pursuant to Fed.R.Civ.P. 12(b)(6) is granted.

12. Allegations regarding the unaudited financial statements for the six month period ending June 30, 1993 are immaterial with respect to D & T;

## VI. D & T's Motion to Dismiss the Section 10(b) Claim.

■ Plaintiffs claim that defendant D & T violated § 10(b) and Rule 10b–5 of the 1934 Act. Defendant D & T audited Sapiens' 1992 financial statements contained in the Offering Circular. In order to withstand a motion to dismiss, a plaintiff pleading a § 10(b) and Rule 10b–5 cause of action must allege that, in connection with the offering or sale of a security, the defendant (1) "made a false material representation or omitted to disclose material information" and (2) the defendant "act[ed] with scienter." *Acito,* 47 F.3d at 52; *In re Time Warner, Inc. Securities Litigation,* 9 F.3d 259, 264 (2d Cir.1993). The standard for pleading these elements of a § 10(b) claim is stated in Fed.R.Civ.P. 9(b), where "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Shields,* 25 F.3d at 1127. Under this standard, plaintiffs have failed to allege facts indicating that D & T made a fraudulent statement and have also failed to allege facts indicating that D & T acted with scienter.

■ With respect to plaintiffs' failure to allege a fraudulent statement made by D & T, the complaint alleges that the financial statements in the Offering Circular "contained untrue statements of material fact and omitted to disclose material facts in various respects." (Complaint ¶ 20.)[12] The only allegations of statements attributed to D & T, however, are stated in paragraphs 19 and 20 of the Complaint. Paragraph 19 alleges, "Among other things, the Offering Circular contained audited financial statements of Sapiens certified by defendant D & T for the fiscal year ended December 31, 1992 (the '1992 financials'), as well as unaudited financial statements for the six month period ending June 30, 1993 (the '1993 Six–Month Financials')." This paragraph alleges mere certification and no wrongdoing by D & T. Paragraph 20 alleges that:

D & T issued no statement about these financial statements.

"Said financial statements contained untrue statements of material fact and omitted to disclose material facts in various respects, including but not limited to the certification by defendant Deloitte that its audit of the 1992 financials had been conducted 'in accordance with generally accepted auditing standards' and that the 1992 Financials 'presented fairly, in all material respects, the financial position of [Sapiens] and subsidiaries as of December 31, 1992 and the results of their operations and their cash flows for the year then ended in accordance with generally accepted accounting principles.' In fact, the 1992 Financials falsely inflated the Company's revenues and income in that, among other ways and without limitation, they purported to recognize revenue from license sales under distribution and marketing agreements upon shipment of the software and either execution of a signed contract or acceptance of the invoice, and from license sales to end users upon delivery of the software and acceptance by the end user or a signed contract, despite and without disclosing serious uncertainty concerning (i) the purchasers' ability to pay and their economic substance apart from Sapiens; (ii) whether transactions were real or instead 'sham' transactions involving contingent or non-existent obligations on the part of purchasers; (iii) whether the price to be paid pursuant to transactions was fixed or determinable at the time they were entered into; (iv) whether the risk of loss had passed; and/or (v) despite uncertainty about the adequacy and completeness of contract executions and sales approvals."

Thus, in paragraph 20, plaintiffs' allegations about D & T are that the following statements on its audit opinion were false: (1) that its audit of the 1992 Sapiens financial statements had been conducted in accordance with generally accepted auditing standards ("the Auditing Standards"); and (2) that Sapiens 1992 financial statements "present fairly, in all material respects, the financial position of [Sapiens] as of December 31, 1992 . . . and the results of their operations and their

cash flows for the year[ ] then ended in conformity with generally accepted accounting principles" ("the Accounting Principles"). (Hammond Decl., Ex. A at 86.)

 With respect to plaintiffs' allegation about Auditing Standards ("allegation (1)"), there is no other allegation in the complaint that D & T violated any specific auditing standard. Thus the first allegation lacks the particularity required by Rule 9(b).

 With respect to plaintiffs' allegation about Accounting Principles ("allegation (2)"), paragraph 20 goes on to expand on the general allegation by alleging that the 1992 financials falsely inflated Sapiens' revenues and income by recognizing revenue from license sales without disclosing several types of uncertainties and, in paragraph 22 [13], alleges that unspecified defendants violated certain Accounting Principles. These allegations do not comply fully with the requirements of Rule 9(b) set forth in *Acito*, which provide that "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito*, 47 F.3d at 51; *Mills*, 12 F.3d at 1175.

Plaintiffs have specified D & T's statements in the audit opinion which it contends were false, i.e., allegations 1 and 2, thus complying with the first requirement, and by referencing the audit opinion identifies the speaker and the time and place of the statements, thereby satisfying the second and third requirement. Paragraph 22, however, only states what Accounting Principles are alleged to be violated and does not plead facts showing who violated these principles, how they were violated, or why D & T may be charged with fraud for their violation. Additionally, Paragraph 22 alleges violations of Accounting Principles by the "defendants," but does not contain any specific allegation about D & T, which was solely involved as the auditor. Plaintiffs also fail to explain why the alleged violation of Accounting Principles rendered the statements fraudulent and do not meet the fourth requirement.

---

**13.** Paragraph 21 alleges only a violation by Sapiens of its own policy.

In making its allegation in Paragraph 20, plaintiffs' complaint quotes from D & T's audit opinion selectively, failing to quote portions of the audit opinion which stated (1) "financial statements are the responsibility of [Sapiens'] management. Our responsibility is to express an opinion on these financial statements based on our audits"; (2) "evidence supporting the amounts and disclosures in the financial statements" were examined "on a test basis"; (3) .its audit had been conducted in accordance with the Auditing Standards; and (4) "in our opinion, . . . [the] 1992 and 1991 consolidated financial statements present fairly . . . the financial position of [Sapiens] . . . as of December 31, 1992 . . ., and the results of their operations and their cash flows for the year[ ] then ended in conformity with generally accepted accounting principles." (Hammond Decl., Ex. A at 86.) [14] Plaintiffs have failed to allege facts demonstrating that D & T did not follow the Auditing Standards or check Sapiens' application of the Accounting Principles in its Audit.

Plaintiffs contend, however, that because the auditing process is peculiarly within D & T's knowledge, they need not plead facts to demonstrate the noncompliance with the Auditing Standards under Rule 9(b), and cite *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2nd Cir.1987) in support. (Pls.Mem. at 38.) In *DiVittorio*, the court states that when fraud allegations are "peculiarly within the opposing party's knowledge," the complaining party must still allege "facts upon which the belief is based." *DiVittorio*, 822 F.2d at 1247. Plaintiffs, however, have limited their pleading of any violation of the Auditing Standards to a single conclusory allegation in Paragraph 20, and thus fail to meet the standard under Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b).

Scienter may also be pled by alleging facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52; *Shields*,

25 F.3d at 1128. Although plaintiffs have not alleged any specific fraudulent violation of the Auditing Standards by D & T, they nevertheless contend that they have alleged scienter because they have alleged that the audited financial statements were not prepared in accordance with the Accounting Principles. They overlook that a violation of an Accounting Principle by the preparer of financials may not be detected by a properly conducted audit.

Plaintiffs, citing *CMNY Capital, L.P. v. Deloitte & Touche*, 821 F.Supp. 152, 165 (S.D.N.Y.1993), argue that the complaint alleges conduct "so far outside the boundaries of professional behavior that recklessness may be inferred." *CMNY Capital, L.P.*, 821 F.Supp. at 165.

In *CMNY*, the complaint specifically alleged facts in support of a theory of reckless disregard of the auditing procedures. *CMNY*, 821 F.Supp. at 157. After stating that D & T "[i]n its audit of the fiscal year 1988 statement . . . manifested . . . recklessness by failing to perform the following audit procedures," the complaint in *CMNY* listed the actual specific audit procedures that D & T allegedly failed to follow and explained why its failure to follow the procedures was significant. *CMNY*, 821 F.Supp. at 157 (after alleging D & T failed to conduct such a review, the complaint contained the following allegation: "Cut-off procedures for year-end sales should have been reviewed. A physical presence, as well as a review of subsequent shipments to sale dates, would have revealed cut-off problems.") In contrast, the most the plaintiffs allege here are the enumerated violations of the Accounting Principles in paragraph 22. (*See, e.g.,* Complaint ¶ 22(a) which states: "[Defendants] violated the principle that revenue be recognized only when a transaction is completed, with appropriate provision for uncollectible accounts.") The allegations in this complaint do not allege facts showing why any violation of Auditing Principles resulted in a material misstatement of fact in the financials, nor do they show that D & T failed to follow proper audit procedures. *Acito*, 47 F.3d at 52; *Shields*,

14. There is no certification that, in fact, the financial statements had been prepared by Sa- piens in conformity with the Accounting Principles.

25 F.3d at 1128. Plaintiffs merely allege that Accounting Principles were violated in the preparation of the financials, which D & T made clear in its audit opinion were Sapiens' responsibility. (Hammond Decl., Ex. A at 86.) Therefore, the Complaint's conclusory allegations fail to allege facts sufficient to infer scienter on the part of D & T.

 Plaintiffs also contend that the complaint adequately alleged scienter by alleging facts outlining how D & T had the "motive" and "opportunity" to defraud. *Ades v. Deloitte & Touche*, 799 F.Supp. 1493, 1498 (S.D.N.Y.1992). Plaintiffs contend that the allegations stating that Sapiens and D & T had a business relationship between 1991 and 1994, and the fees from that relationship would be significant to the specific accountant handling D & T's business, constitute allegations of scienter. (Pls.Mem. 44–45.) There is no legal precedent which supports the contention that such allegations are sufficient. In any event, this theory is spelled out only in plaintiffs' motion papers. The complaint does not allege facts upon which this inference of scienter is based.

Plaintiffs fail to allege significant facts from which to infer scienter, and therefore, do not meet their burden under Rule 9(b). *In re Integrated Resources Real Estate Ltd. Partnerships Securities, Litigation.*, 815 F.Supp. 620, 670 (S.D.N.Y.1993) (plaintiffs failed to allege any reckless behavior on part of auditors and thus failed to demonstrate scienter). For the forgoing reasons, the § 10(b) and Rule 10b–5 claims against defendant D & T are dismissed pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b).

## CONCLUSION

Defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction is DENIED. Defendants' motion to dismiss the complaint as barred by the statute of limitations is DENIED. Defendants Sapiens and SB's motion to dismiss the § 12(2) claim pursuant to Fed.R.Civ.P. 12(b)(6) as foreclosed by *Gustafson*, —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) is DENIED. Defendant SB's motion to dismiss the § 10(b) claim pursuant to Fed.R.Civ.P. 12(b)(6) and

9(b) is GRANTED. Defendant SB's motion to dismiss the controlling person claims pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED. Defendant D & T's motion to dismiss the § 10(b) claim pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) is GRANTED.

For the reasons heretofore stated, the plaintiffs' common law claims against D & T and SB set forth in Count IV are also dismissed.

IT IS SO ORDERED.