Arthur S. PLEVY, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Charles A. HAGGERTY, et al., Defendants.

And related cases.

Nos. CV 97–9200 SVW, CV 98–0890 SVW, CV 98–0920 SVW, CV 98–0921 SVW, CV 98–0926 SVW, CV 98–1062 SVW, CV 98–1465 SVW and CV 98–1881 SVW.

United States District Court, C.D. California.

Aug. 21, 1998.

Lionel Z. Glancy, Peter Arthur Binkow, Lionel Z. Glancy Law Offices, Los Angeles, CA, Gary P. Weinstein, Wechsler Harwood Halebian & Feffer, New Yrok, NY, for Plaintiff.

Joseph P. Busch, III, Wayne W. Smith, Andrea E. Neuman, Gibson Dunn & Crutcher, Irvine, CA, for Defendants.

## ORDER DISMISSING CONSOLIDATED AMENDED COMPLAINT WITH PREJUDICE

WILSON, District Judge.

### I. BACKGROUND

This case is a class action brought by certain shareholders of Western Digital Corporation ("WDC") against WDC and several of its officers and directors.[1]

---

1. The individual defendants in this case are Charles Haggerty, the Chairman, President, and Chief Executive Officer; Katheryn Braun, the President and Chief Operating Officer of the Personal Storage Division; Marc Nussbaum, the Senior Vice President of Engineering of the Personal Storage Division; David Schafer, the Senior Vice President of World Wide Sales; and Duston Williams, the Senior Vice President of Finance and Chief Financial Officer.

Plaintiffs allege that Defendants committed federal securities fraud in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 of the Securities Exchange Commission ("SEC") regulations promulgated thereunder. WDC manufactures hard disk drives ("HDDs"), which are used in computers to store program applications and other electronic files. WDC is the third largest HDD manufacturer in the world, second only to Seagate and Quantum. WDC and Seagate trade on the New York Stock Exchange ("NYSE"), while Quantum trades on the NASDAQ.

Plaintiffs allege that during the Class Period (July 25, 1996 to January 29, 1998), Defendants engaged in conduct that was designed to, and did, artificially inflate the market price of WDC stock. (Consolidated Amended Complaint ("CAC"), ¶ 1). At the start of the Class Period, WDC stock traded at 13 3/8. It rose to a high of 53 ¼ on August 25, 1997, and then fell to a low of 14 ⁹⁄₁₆ on December 22, 1997. At the close of the Class Period, WDC stock traded at 17 1/4.[2]

In 1995, the HDD industry was shifting from traditional thin-film ("TF") head technology to magnetoresistive ("MR") technology. MR technology allows HDD manufactures to store more information in the same physical surface area, and decreases the price per megabyte of storage capacity. WDC was the last major HDD manufacturer to shift from TF to MR. Defendants publicly stated that WDC management made a strategic decision to transition to MR later than its competitors in order to benefit from the industry learning curve.

After several quarters of record earnings, on September 29, 1997, WDC warned investors that it would not meet analysts' earnings expectations for the first fiscal quarter of 1998.[3] This announcement began the downward slide of WDC's stock price. On November 7, 1997, WDC announced that it may take a non-recurring charge of $15 to $30 million. On December 2, that estimate was increased to $85 to $95 million, which resulted in an actual charge of $148 million announced on January 29, 1998.

The allegations in the Complaint all involve Defendants' conduct and statements regarding the shift in technology from TF to MR, and its effects on WDC's operations. The alleged misrepresentations by Defendants can be categorized as follows:

▶ Earnings were false because Defendants failed to take a write-down for WDC's obsolete TF products in inventory

▶ Statements regarding the viability of WDC's 3–inch mobile HDD using MR technology were false and misleading because the product
 ● was riddled with technical problems
 ● would have to be abandoned because of limited production capacity
 ● would have to be entirely written off

▶ Statements that WDC's late transition to MR was a strategic decision in order to benefit from industry learning curve were false and misleading because
 ● WDC had no reasonable transition plan
 ● WDC lacked technological ability to produce reliable MR HDDs, due in part to the fact that the 3–inch MR HDD was riddled with technical difficulties
 ● WDC did not benefit from the industry learning curve

▶ WDC's statements that its failure to properly transition to MR *could* ha-

---

**2.** All prices are adjusted for the two-for-one stock split that WDC declared on May 2, 1997.

**3.** WDC's fiscal years run from approximately July 1 of the prior year to June 30 of the following year. Thus, the first fiscal quarter for 1998 covered July, August, and September of 1997.

veadverse effect were false because the inability to properly transition was *already* having an adverse effect on WDC's operations

▶ Statements regarding past and future success of WDC were false and misleading because:

• recent success was temporary and was due to the fact that WDC's competitors were transitioning from TF to MR

• WDC was far behind in transitioning to MR, which made past growth unsustainable

• the 3–inch MR HDD was plagued with technical problems

• WDC would incur substantial costs in transitioning to MR, including an inventory write-down for obsolete TF products

▶ Statements regarding non-recurring charge were false because

• Defendants initially stated that the charge was "potential," when in fact it was a certainty

• Defendants knew that the charge would be much greater than reported

• Defendants failed to disclose the fact that the charge was due to obsolescence of TF products and technical problems in MR products

## II. ANALYSIS OF DEFENDANTS' MOTION TO DISMISS

### A. Standard for Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides a mechanism for a party to dismiss a claim if the claimant failed to state a claim upon which relief can be granted. F.R.C.P.Rule 12(b)(6). A 12(b)(6) dismissal will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Thus, in evaluating a complaint, only its legal sufficiency, and not the weight of the evidence supporting it, may be considered. Furthermore, a court must accept as true all factual allegations in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

However, "[i]f a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.) (citations omitted), *cert. denied,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987). Moreover, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). A court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir. 1998). Finally, a court may take judicial notice of matters of public record outside the pleadings without converting a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

### B. Defendants' Request for Judicial Notice of Exhibits

Defendants request the Court to take judicial notice of 116 exhibits that Defendants submitted with their Motion to Dismiss. Rule 201 of the Federal Rules of Evidence, which governs judicial notice, states in pertinent part:

A judicially noticed fact must be one not subject to reasonable dispute in that

it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed.R.Evid. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." *Id.* Rule 201(d). On a motion to dismiss, a court may take judicial notice of matters of public record outside the pleadings. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *see also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (court may take judicial notice of SEC filings on motion to dismiss).

Exhibits 16–21, 23–24, 50–79, 85–103, and 106–116 consist of WDC SEC filings, WDC press releases, analysts' reports, news articles, and a tabular representation of WDC's stock price. All of these exhibits are cited, quoted from, and/or referenced in the CAC. Thus, under *Durning* and *Branch,* these exhibits may be considered in ruling on the motion to dismiss. Furthermore, as the contents of these exhibits are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, the Court takes judicial notice of them. Plaintiffs do not object to these exhibits.

Plaintiffs do object to Exhibits 1–9, 11–15, 22, 25–49, 80–84, and 104–105.

■ Beginning with Exhibits 11–15, 22, and 25–29, these exhibits are WDC's SEC filings, including 10–Ks, 10–Qs, annual reports, and Form 4s that were not cited or quoted from in the CAC. However, the CAC states that the allegations are based on, *inter alia,* "a review of the public filings and press releases of defendant Western Digital Corp." (CAC at 2:4–5). Thus, the CAC does reference these filings. Moreover, as these documents are public records required by the SEC to be filed, the Court may take judicial notice of them. *See Kramer,* 937 F.2d at 774 (court may take judicial notice of SEC filings on motion to dismiss).

Exhibits 30 through 49 are SEC filings by Seagate and Quantum. Plaintiffs object to these exhibits on the ground that they are not specifically mentioned in the CAC. However, the CAC contains allegations regarding Quantum's and Seagate's introduction of MR products and whether these companies took write-downs on inventory for obsolescence. Moreover, as these documents are public records required by the SEC to be filed, the Court may take judicial notice of them.

■ Exhibits 80 through 84 comprise four Paine Webber reports and one Salomon Brothers report on WDC. Plaintiffs object to these exhibits on the ground that the CAC does not cite or quote from these analysts' reports. However, the CAC does cite and quote from nineteen other analysts reports, some of which were prepared by Paine Webber and Salomon Brothers. Defendants argue that for the sake of completion, the Court should take judicial notice of these five additional reports. Although an analysts' report may be proper subject matter for judicial notice, the Court does not believe that these exhibits are relevant to Defendants' motion to dismiss. Thus, the Court will not consider these exhibits in ruling on Defendants' motion.

■ Exhibits 104 and 105 are tabular representations of the daily stock prices of Seagate and Quantum, respectively, as published by the NYSE. Plaintiff objects to these exhibits on the ground that they are not specifically mentioned in the CAC. Although the stock price of a publicly-traded company is proper subject matter for judicial notice, the Court does not believe that these exhibits are relevant to Defendants' motion to dismiss. Thus, the Court will not consider these exhibits in ruling on Defendants' motion.

■ Finally, exhibits 1 through 9 are graphical and tabular data of information contained in SEC filings prepared by Defendants. Given that the Court has taken judicial notice of the SEC filings of WDC,

Seagate, and Quantum, Defendants' summaries of the data contained therein are unnecessary. Thus, the Court will not consider these exhibits in ruling on Defendants' motion.

Accordingly, the Court takes judicial notice of Exhibits 11–79, 85–103, and 106–116.

### C. Pleading Standard

Rule 10b–5, promulgated by the SEC pursuant to § 10(b) of the 1934 Act (codified at 15 U.S.C. § 78j(b)), makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. As interpreted by the Ninth Circuit, the elements of a Rule 10b–5 violation are: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996). The Supreme Court has held that the term "scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Although the Court has never held that recklessness also constitutes scienter,[4] every circuit court has so held. *See, e.g., Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990), *cert. denied,*

499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

In December of 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which amended the 1934 Act. The PSLRA, *inter alia,* specifies the required pleading standard for securities fraud actions:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1), (2) (1997). "[T]he court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." *Id.* § 78u–4(b)(3)(A).[5]

---

**4.** In *Hochfelder,* the Court stated that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Id.*

**5.** As quoted above, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* § 78u–4(b)(1). Defen-

The CAC alleges that in the fall of 1997 into early 1998, Defendants disclosed certain information about WDC's operations that the market deemed negative, thereby causing WDC stock to decline substantially. The vast majority of Defendants' alleged misrepresentations occurred while WDC stock was rising from the teens to the low fifties. When WDC stock ultimately fell back to the teens, Plaintiffs filed their lawsuit. The Ninth Circuit, in *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541 (9th Cir.1994), articulated the standard for pleading alleged misrepresentations that occurred prior to a significant decline in the stock price:

> What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood. *In the face of such intervening events, a plaintiff must set forth, as part of the circum-stances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made.* This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.

*Id.* at 1548–49 (emphasis added); *see also Zeid v. Kimberley*, 930 F.Supp. 431, 436 (N.D.Cal.1996) (holding that conclusory allegations are insufficient to support a claim of fraud where complaint is devoid of any contemporaneous facts which tend to show that the allegedly misleading statements were false when made).

### D. Alleged Misrepresentations

#### 1. Statements by Analysts

■ To a large extent, the allegations in the CAC are based upon statements made by third-party analysts. Plaintiffs allege that Defendants used analysts to disseminate information to the public. There are two questions that arise with respect to these statements: whether Defendants can be liable for the analysts' statements, and whether Defendants can be liable for their own statements made to the analysts.

"In order to be liable for unreasonably disclosed third-party forecasts, defendants must have put their imprimatur, express or implied, on the projections." *In re Syntex Corp. Securities Litigation*, 95 F.3d 922, 934 (9th Cir.1996); *see also In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1410 (9th Cir.1996) (same), *cert. denied*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). The CAC does not allege that WDC put its imprimatur on any of the analysts projections. "Instead, these statements were the culmination of a

---

dants, relying on *In re Silicon Graphics*, 970 F.Supp. 746 (N.D.Cal.1997), argue that although Plaintiffs never use the phrase "information and belief" in the CAC, the allegations necessarily are based upon information and belief. Defendants claim that Plaintiffs have not satisfied the standard for pleading on information and belief because the CAC does not state with particularity all facts on which that belief is formed.

The Court need not address this issue. Regardless of whether the CAC is plead on personal knowledge or on information and belief, it provides insufficient facts that Defendants' alleged misrepresentations were false when made.

one-way flow of information, from [the company's] representatives to analysts and from the analysts to their customers." *In re Syntex*, 95 F.3d at 934.

The only instances in which Defendants arguably adopted third-party statements are where they expressed that they were "comfortable" with the analysts' earnings forecasts. (CAC ¶¶ 46, 94, 104, 109, 149). It is debatable whether these statements place the company's imprimatur on the projection, i.e., whether the statements were "an approval of that which is published," as defined by Webster's. The Court, however, need not decide this question. Even if Defendants did place WDC's imprimatur on the analysts' earnings estimates, those estimates were not false. The following table compares the analysts' forecasts to WDC's actual earnings for each of the periods that the CAC alleges that Defendants adopted the forecasts.[6]

| CAC ¶ | Forecast | Actual[7] | Period |
|-------|----------|-----------|--------|
| 46 | $0.49 – $0.59 | $0.71 | 4Q 1996 |
| 94 | $1.35 – $1.40 | $1.76 | 3Q 1997 |
| 104 | $5.71 | $5.70* | Fiscal 1997 |
| 109 | $1.85 – $1.95 | $1.90* | 4Q 1997 |

As the above table clearly illustrates, WDC's earnings met or exceeded the analysts' forecasts for each period in which the CAC alleges that Defendants adopted the corresponding forecast. Thus, Plaintiffs cannot claim that Defendants artificially inflated the price of WDC stock by adopting overly optimistic earnings estimates. They simply did not.[8]

Turning to the second question, Defendants can be liable for their own false or misleading statements made to analysts. *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996). For each analyst report, the CAC alleges that Defendants' false statements to the analyst made the basis of the report. However, the CAC does not describe what statements Defendants allegedly made to the analysts. Plaintiffs cannot assume that the analysts' reports simply repeated verbatim the statements relayed to them by Defendants. As Defendants' liability hinges on their own statements and not those of the analysts, the CAC must plead Defendants' alleged misrepresentations with particularity. It does not. Thus, Plaintiffs have failed to meet the pleading requirements demanded by Rule 9(b).

### 2. Obsolescence of TF Products

The CAC alleges that Defendants violated Rule 10b–5 by failing to take a write-down against earnings for obsolete inventory as required by generally accepted accounting principles ("GAAP").[9] Plaintiff's theory is that because the industry was transitioning from TF to MR technology, WDC's TF products became obsolete. The two facts that the CAC cites in support of this allegation are: (1) WDC's inventory rose through the Class Period; and (2) WDC ultimately took a write-down for obsolescence in January of 1998, for the second quarter of fiscal 1998 (ending December 27, 1997).

---

**6.** In ¶ 149 of the CAC, Plaintiffs allege that on November 18, 1997, Defendants stated that they were comfortable with the analysts' earnings estimates for fiscal 1998 of $1.50 to $1.70 per share. WDC's fiscal 1998 ended around June 30, 1998. As this date occurred after Plaintiffs filed the CAC, Plaintiffs necessarily could not allege whether Defendants' statement was false.

**7.** An asterisk in this column indicates an adjustment of the actual earnings to account for the two-for-one stock split that WDC declared on May 2, 1997. When displayed in this way, the earnings estimate published before the

stock split is readily comparable to the actual earnings announced after the stock split.

**8.** Plaintiffs also allege that the WDC's earnings themselves were false and misleading for several reasons. The Court addresses this allegation below. *See infra* Parts II.D.2 and II.D.5.

**9.** "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate...." 17 C.F.R. § 210.4–01(a)(1).

The parties agree that GAAP requires a company to take a write-down for obsolete inventory only if the market value of the inventory falls below the cost of the inventory. The CAC states in a conclusory manner that WDC's TF inventory was unsalable and obsolete. The problem with the CAC is that it does not, and cannot, allege that WDC's TF products were being sold below cost. WDC made money in every single quarter through the first quarter of fiscal 1998, ending September 27, 1997. (*See* Exhs. 11–14, 17–20, 23–24). Furthermore, in each quarter, WDC beat the earnings of the year-ago quarter. WDC is a one-product company—it manufactures only HDDs—thus the earnings had to be generated from sales of HDDs. Even if demand for its TF products was somewhat waning throughout the Class Period (which could explain the increase in inventories), TF products were still being sold at a profit. Thus, they were not obsolete under the cost basis of accounting prescribed by GAAP.

Shareholders brought a very similar case against Seagate in 1989. *See In re Seagate Technology II Securities Litigation*, 1989 WL 222969 (1989). At that time, the 5 ¼ inch floppy disk drives were being replaced by the 3½ inch rigid disk drives. Seagate was late in transitioning to the rigid drives. The plaintiffs claimed that Seagate's lower profit margins were caused by the obsolescence of the 5 ¼ inch drives. They further alleged that Seagate's failure to take a write-down for obsolescence violated Rule 10b–5. In response, Seagate pointed out that the 5 ¼ inch floppy disk drives were not obsolete as they continued to make up a substantial portion of Seagate's sales and profits. The Court agreed with Seagate. Because Seagate was still enjoying a profit, albeit smaller, from its sales of the 5 ¼ inch drives, "[f]rom an economic viewpoint, then, the disks are not obsolete." *Id.* at *5. The Court concluded that Seagate was not required under federal securities laws to disclose the alleged obsolescence of the 5 ¼ inch disk drives. *Id.*

Nor can Plaintiffs argue that Defendants did not caution investors of the possibility of obsolescence. WDC's 10–K for fiscal 1996, which was issued near the start of the Class Period, warned:

> The market for the Company's products is subject to rapid technological change and short product life cycles. To remain competitive, the Company must anticipate the needs of the market and successfully develop and introduce new products in a timely fashion. If not carefully planned and executed, the introduction of new products may adversely affect sales of existing products and increase risk of inventory obsolescence.

(Exh. 14 at 6). In its 10–K for fiscal 1997, issued in July of 1997, WDC further cautioned the investing public about the risk of product obsolescence:

> The majority of the Company's hard drive products currently utilize conventional thin film or metal-in-gap inductive head technologies. The Company believes that the magneto-resistive ("MR") heads, which enable higher capacity per hard drive than conventional thin film or MIG inductive heads, have replaced thin film and MIG inductive heads as the leading recording head technology. Several of the Company's major competitors have incorporated MR head technology into some of their current products, and ... the Company's competitors have achieved time-to-market leadership.

(Exh. 20, at 20).

Furthermore, even without these warnings of possible obsolescence, Plaintiffs' claims fail. "We have observed that, as a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals. Indeed, technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain." *In re Stac*, 89 F.3d at 1410 (quotations and citations omitted).

Finally, the fact that WDC ultimately took a write-down for obsolescence does not help Plaintiffs. Plaintiffs seem to point to the bad news that occurred in the fall of 1997, and then assume the role of Monday morning quarterback to explain why all of the statements leading up to the demise were false. This tactic is grossly insufficient under Ninth Circuit authority. *See In re GlenFed*, 42 F.3d at 1548–49. Plaintiffs fail to point any direct or circumstantial facts, such as, but not limited to, inconsistent contemporaneous statements or internal reports that would show that WDC's TF products were being sold at a loss prior to the second quarter of fiscal 1998, when the write-down was taken. Thus, Plaintiffs' allegations that Defendants failed to take a write-down for obsolete inventory in violation of GAAP do not meet the heightened pleading standard required for securities fraud cases.

### 3. Viability of 3–inch Mobile MR HDD

█ Plaintiffs allege that Defendants' made statements regarding WDC's 3–inch mobile MR HDD that were false and misleading. For example, the CAC alleges that during an interview with Computer Reseller News, published on April 7, 1997, Haggerty (CEO) stated:

> We just announced a 3–inch drive for the mobile market. But we experienced some problems regarding heat dissipation. This drive works with glass, not aluminum platters, and glass behaves different from aluminum. Right now, we're verifying the fix; volume shipments will start within the next 30 to 40 days.

(CAC ¶ 95). The CAC contains other alleged statements that the 3–inch mobile MR HDD would be a successful product for WDC. However, on December 2, 1997, WDC announced that in order "to sharpen its focus and resources on its desktop and enterprise storage product lines," it would "exit the 3–inch portable hard drive business and re-deploy resources into its leadership desktop storage business and the

expanding opportunity in its enterprise storage business." (CAC ¶ 150). The CAC alleges that Defendants' prior statements as to the viability of the 3–inch HDD were false because (1) the 3–inch HDD was riddled with technical problems that could not be cured, namely the heat dissipation problem; (2) the "fix" to which Haggerty alluded could not solve the problem, a fact long since known to Haggerty; (3) Haggerty failed to disclose that the volume shipments would in large measure be canceled or returned due to the defect, resulting in the withdrawal of the product from the market; (4) Defendants failed to correct the statements regarding the curability of the defect; and (5) the 3–inch HDD would have to be abandoned due to WDC's limited production capacity caused by WDC's reliance on its outdated TF products.

Plaintiffs cite no facts whatsoever to support their allegations that the 3–inch HDD was "riddled" with technical problems, that it was "fatally flawed," or that WDC lacked the production capacity to meet a high demand for the product. Plaintiffs point to a statement by Haggerty in April of 1997 where he disclosed a heat dissipation problem. From this statement, Plaintiffs simply speculate that the reason that WDC exited the 3–inch mobile market eight months later was because this defect was incurable. WDC publicly stated that it was refocusing on its desktop products, and moving away from the mobile market. Plaintiffs have offered no direct or circumstantial facts, such as, but not limited to, inconsistent contemporaneous statements or internal reports, that would prove this statement false.

Plaintiffs make a conclusory allegation that volume shipments were canceled. Yet, Plaintiffs do not name a single entity that canceled its order or returned any HDDs to WDC. There are no specific allegations of a recall or of any negative reports about the product by analysts or the trade press. Given that the 3–inch HDD was in volume production, the lack of such

facts makes Plaintiffs' claim untenable. "[C]onclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC,* 139 F.3d 696, 699 (9th Cir.1998).

### 4. WDC's Late Transition to MR Technology

Plaintiffs next allege that Defendants' statements that WDC's late transition to MR was part of a strategic decision to benefit from the industry learning curve was false and misleading because (1) WDC had no reasonable transition plan; (2) WDC lacked technological ability to produce reliable MR HDDs, due in part to the fact that the 3–inch MR HDD was riddled with technical difficulties; and (3) WDC did not benefit from the industry learning curve.

Once again, Plaintiffs make conclusory allegations. Plaintiffs are simply looking at what happened in January of 1998, and asserting that Defendants' earlier statements must have been false and misleading at the time they were made. Plaintiffs cite no direct or circumstantial facts, such as, but not limited to, contemporaneous inconsistent statements or internal reports that would support any of the three above reasons why Defendants' statements regarding WDC's strategy were false when made. Even if WDC did not benefit from the industry learning curve, that does not make the proffered strategy false, it just makes it unsuccessful.

### 5. Statements Regarding Health of WDC

Plaintiffs quote a slew of statements by Defendants (mainly Haggerty), which are best described as hyperbole or corporate puffery. For example, Haggerty stated on July 25, 1996 that WDC's success was due to its "crisp execution on the timing, performance, reliability, and quality" of its products (CAC ¶ 51); WDC's 1996 Annual Report released on September 30, 1996 stated that WDC expected "growth" and "huge opportunity" in the future, and that WDC's hard drives "have a tradition of technological leadership, with innovative features and significant performance advantages" (*Id.* ¶¶ 60, 62); Haggerty stated on January 13, 1997 that WDC's results "clearly demonstrate[ ] the inherent advantages of [its] business model" (*Id.* ¶ 79); Haggerty stated several times between January and May of 1997 that WDC was experiencing strong demand for its products (*Id.* ¶¶ 84, 104, 107); Haggerty stated in a conference call on January 13, 1997 that business was moving at a "blistering pace," that "visibility" of future earnings was "good," and that WDC has "developed one of the most solid financial structures in corporate America today" (*Id.* ¶ 84); and so on. Plaintiffs also make great hay about Haggerty's August 10, 1997 statement, in which he lambasted short-sellers of WDC

> I say, fine, let them short the stock and let them have to cover.... One of my favorite joys in life is squeezing the shorts....

(*Id.* ¶ 120).

Unless such statements are used to emphasize and induce reliance upon a material misrepresentation, they alone are not actionable as no reasonable investor would rely upon them. *See Casella v. Webb,* 883 F.2d 805, 808 (9th Cir.1989). An instructive case is *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993). There, the defendant company stated in its Annual Report that regulatory changes had "created a marketplace for the [Department of Energy] Services Group with an expected annual growth rate of 10% to 30% over the next several years" and "the DOE Services Group is poised to carry the growth and success of 1991 well into the future." The Fourth Circuit dismissed the complaint on the ground that no reasonable investor would rely on such vague and loose statements.

Plaintiff also take issue with Defendants' announcements of record earnings by WDC. The CAC alleges that Defendants' rosy statements regarding its positive earnings reports were false and misleading

because (1) WDC's recent success was due to the fact that its competitors were in the midst of transitioning from TF to MR, which allowed WDC's TF products to experience a temporary renaissance in sales; (2) WDC was far behind its competitors in transitioning from TF to MR; and (3) when WDC entered the MR market, it had not benefited by the industry learning curve. "These alleged nondisclosures are, in substance, failures to make a forecast of future events. Put another way, what the complaint avers is that [Defendant] omitted to state the 'fact' that future prospects may not be as bright as past performance. Absent allegations that [Defendant] withheld financial data or other existing facts from which forecasts are typically derived, the alleged omissions are not of material, actual facts." *In re VeriFone Securities Litigation,* 11 F.3d 865, 869 (9th Cir.1993). "[C]ompanies are not required to predict the future." *In re Stac,* 89 F.3d at 1409.

As was discussed above and more fully below, see supra Part II.D.2 and *infra* Part II.E, WDC made more than adequate disclosures in its public filings regarding its late transition to MR. For example, in its 10–Q for the second fiscal quarter of 1997 ending December 28, 1996, just six months into the Class Period, WDC warned investors that past results were not sustainable:

> The Company does not expect that the percentage increase in revenues, operating income and net income during the past few years represent a consistent reliable trend that can be expected to continue in the future. The hard drive business remains challenging and cyclical.

(Exh. 20, at 18). Thus, Plaintiffs' allegations that Defendants somehow misled the investing public by announcing and publishing WDC's record earnings are wholly without merit.

### 6. Statements Regarding the Non–Recurring Charge and Disappointing Earnings

 After several quarters of record earnings, on September 29, 1997, WDC warned investors that it would not meet analysts' earnings expectations for the first fiscal quarter of 1998. WDC blamed the lower results on the fact that "[h]ard drive pricing significantly weakened in the quarter as a major competitor liquidated excess inventory in the distribution channel." (CAC ¶ 130).

On November 7, 1997, WDC announced that it expected disappointing earnings for the second quarter of fiscal year 1998. In addition, WDC disclosed that it may take a nonrecurring charge of $15 to $30 million. The charge would be "associated with the company's phase-out of thin-film head products in favor of hard drives featuring newer [MR] heads." (*Id.* ¶ 142). On December 2, WDC increased its estimate of the non-recurring charge to $85 to $95 million. In a press release, WDC explained the increase in the estimate:

> The Company had previously announced plans for a one-time charge of between $15 to $30 million associated with its accelerated transition from production of drives with thin film heads. This charge has increased to $85–$95 million, *primarily due to a further reduction of unit volumes of desktop hard drives with TFI heads* and from the Company's decision to exit the 3–inch portable hard drive business.

(*Id.* ¶ 150). Finally, on January 29, 1998, WDC announced in a press release that the actual non-recurring charge would be $148 million.

> Special charges in the second quarter resulted primarily from actions to reduce the Company's exposure to the sustained oversupply and unusually competitive pricing pressures in the hard drive industry and to sharpen its focus and resources on its desktop and enterprise storage product lines. The actions included a reduction in the planned production of desktop hard drives, an acceleration of the transition from thin-film recording head technology to magneto-

resistive head technology, and termination of its 3–inch hard drive product line targeted at the mobile PC marketplace. The special charges include estimated component cancellation charges and inventory and other asset write-downs. · Also included in the special charges are costs incurred during the quarter on terminated mobile engineering programs and other estimated incremental costs related to the production, sale and accelerated wind-down of thin-film and ramp-up of MR products.

(*Id.* ¶ 161).

Plaintiffs claim that Defendants' above statements were fraudulent because Defendants knew all along that the nonrecurring charge was a certainty and that it would be $148 million. Like Plaintiffs' other allegations of fraud, the CAC provides no factual support for these bald assertions. Plaintiffs rely on *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir.1995), which held that "shortness of time is circumstantial evidence that the optimistic statements were false when made." *Id.* at 1083. However, the Ninth Circuit gave the circumstantial evidence in that case "more weight in view of the absence of any indication of an intervening catastrophic event." *Id.* Here, there were such events between the successive estimates.

The first estimate of the charge announced on November 7 stated that the charge was associated with the transition from TF to MR technology. (CAC ¶ 142). As WDC later explained in its December 2 press release, the second estimate was higher because WDC had since decided to withdraw from the 3–inch mobile market and accelerate its TF–to–MR transition. (*Id.* ¶ 150). Two months later, when WDC announced the actual charge of $148 million, WDC explained that due to sustained oversupply and unusually competitive pricing pressures, it had to take further defensive actions. To lessen the company's exposure to the degrading market conditions, WDC decided to reduce its planned production of desktop products, which result-

ed in component cancellation charges. (*Id.* ¶ 161). Thus, by the time WDC announced the $148 million charge, three categories of items contributed to the charge: transition to MR technology, withdrawal from 3–inch mobile market, and reduction in production of desktop products.

Plaintiffs have offered no evidence to refute WDC's explanations for the increase in the charge. Plaintiffs simply imply that the entire charge was a write-down for the obsolescence of WDC's TF products, and that Defendants released the information slowly to prevent an enormous decline in the price of WDC stock. They make a great deal of the fact that the $148 million charge was approximately equal to the increase in WDC's inventory throughout the Class Period. Yet, WDC's press releases, quoted by Plaintiffs in the CAC, undermine Plaintiffs' assertion that WDC's $148 million charge was taken solely to account for obsolete inventory. Given WDC's undisputed explanations for the increases in the charge, Plaintiffs' above argument is merely a conclusion lacking any factual support. As the Ninth Circuit has recognized, markets and consumer demand move swiftly in the high-technology arena. *See In re Stac*, 89 F.3d at 1410 ("[T]echnical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain."). Plaintiffs must provide something other than pure speculation and conjecture regarding the falsity of Defendants' statements and their knowledge of the falsity. Once again, Plaintiffs have failed to meet this requirement.

Furthermore, Plaintiffs' theory that Defendants released the negative information slowly makes no sense. According to Plaintiffs, Defendants did this in order to artificially support the price of WDC stock. However, as will be discussed more fully below, *see infra* Part II.F, not one Defendant sold any stock during the decline in the price that began in September of 1997. Any inference that Defendants' motive was to reap financial gains by leaking the nega-

tive information in a piecemeal manner to the market is contradicted by the fact that Defendants did not sell stock into the declining share price.

### E. Fraud on the Market / Bespeaks Caution Doctrine

■ Defendants also argue that Plaintiffs have not met their burden under a fraud on the market theory. "In a fraud on the market case, the plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information. Provided that they have credibly entered the market through other means, the facts allegedly omitted by the defendant would already be reflected in the stock's price; the mechanism through which the market discovered the facts in question is not crucial." *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1114 (9th Cir. 1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *see also In re Stac*, 89 F.3d at 1410 (holding that if "the information that defendants are alleged to have withheld from or misrepresented to the market has entered the market through other channels, the market will not have been misled, and ... plaintiffs' claims ... will fail") (alterations in original).

The "bespeaks caution" doctrine "provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. The doctrine serves to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement." *In re Stac*, 89 F.3d at 1408 (quotations and citations omitted).

At the start of the Class Period, WDC issued its 10–K for fiscal year 1996, which stated:

The Company's current product line primarily uses thin film technology. Over the next several years, as storage capacity requirements increase, the Company expects that it will be required to replace thin film heads with magneto-resistive ("MR") heads. *There can be no assurance that the Company will be successful in the transition from thin film heads to MR heads.*

(Exh. 14, at 6) (emphasis added).

In its 10–Q for the first fiscal quarter of 1997 (ending September 28, 1996), WDC again cautioned investors:

All of the Company's hard drive products currently utilize conventional thin film inductive head technology. The Company believes that MR heads, which enable higher capacity per hard drive than conventional thin film heads, will eventually replace thin film inductive heads as the leading recording head technology. Several of the Company's major competitors incorporate MR head technology in some of their current products. *Failure of the Company to successfully manufacture and market products incorporating MR head technology in a timely manner could have a materially adverse effect on the Company's business and results of operations.*

(Exh. 17, at 10) (emphasis added). In its 10–Q for the second fiscal quarter of 1997 (ending December 28, 1996), WDC reiterated the above statement, and added that "the Company's competitors have achieved time-to-market leadership." (Exh. 18, at 11). Finally, in its 10–K for fiscal 1997 (ending June 28, 1997), WDC stated:

The Company believes that the magneto-resistive ("MR") heads, which enable higher capacity per hard drive than conventional thin film or MIG inductive heads, have replaced thin film and MIG inductive heads as the leading recording head technology.... *Failure of the Company to successfully manufacture*

and market products incorporating MR head technology in a timely manner an/or in sufficient volume during 1998 could cause erosion of the Company's market share and have a materially adverse effect on the Company's business and financial position, results of operation or liquidity.

(Exh. 20, at 20) (emphasis added). "The Company does not expect that the percentage increase in revenues, operating income and net income during the past few years represent a consistent reliable trend that can be expected to continue in the future. The hard drive business remains challenging and cyclical." (*Id.* at 18).

Plaintiffs argue that the "bespeaks caution" doctrine does not apply because the above disclosures (1) were nothing but generic, boilerplate statements; and (2) did not disclose the adverse facts that were actually impacting WDC's business. The first ground is ludicrous. The above disclosures specifically addressed the risks particular to the hard drive business and to WDC's future. They are far from boilerplate for they contained clear and specific warnings.

In support of the second ground, Plaintiffs argue that while Defendants stated that certain risks *may* adversely affect WDC's business, those risks *had already* affected WDC's business. Plaintiffs cite a Fifth Circuit opinion, in which the Court stated:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

*Huddleston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir.1981), *rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The Ninth Circuit has rephrased the principle:

> There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed

problems so significant as to require months of delay.

*In re Apple Computer,* 886 F.2d at 1115.

*Huddleston* involved a company in the business of constructing freeways. The prospectus warned the potential investor that "these securities involve a high degree of risk" and that the construction costs might be underestimated. Nonetheless, there was evidence that on the effective date of the registration statement, the defendants already knew that the cost of construction was understated. The Court denied the defendants' motion for summary judgment because a jury could justifiably conclude that the prospectus misstated the costs of completion of the speedway. *Huddleston,* 640 F.2d at 544.

However, the Ninth Circuit distinguished *Huddleston* in *In re Convergent Technologies Securities Litigation,* 948 F.2d 507 (9th Cir.1991). In that case, the plaintiffs alleged that the defendants misled investors by concealing from the market certain cost and production problems regarding one of the company's product lines. One portion of the company's prospectus stated:

> [T]he Company anticipates [NGEN] will be both significantly more powerful and less expensive than existing workstation products.... While the Company believes that the technical risks in the development of these products are well controlled, the product cost objectives are very aggressive and there is no assurance that they can be achieved.

*Id.* at 515 (alterations in original). The plaintiffs countered that this disclosure did not sufficiently warn investors as to the particularized risks then known by the defendants. Siding with the defendants, the Ninth Circuit distinguished *Huddleston:*

> In *Huddleston,* the Fifth Circuit found ineffective the prospectus' statement: "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK." Here, by contrast, the March Prospectus virtually overflows with Convergent's repeated emphasis of significant risk fac-

tors.... Convergent's March Prospectus has very little in common with the prospectus in *Huddleston.*

*Id.* (citations omitted). Thus, the Court reasoned that because the company's disclosures were replete with detailed warnings, the plaintiffs were on notice of the risks in investing, and could not argue that the company's warnings lacked specificity.[10]

In *In re Stac,* Stac was in the business of creating disk-compression software. The complaint alleged that Stac went public knowing, but without disclosing, that Microsoft was about to come out with a competitive product that would impinge on Stac's market share. Stac's prospectus stated that "[a] number of competitors offer products that currently compete with [Stac's] products" and that these companies "could seek to expand their product offerings by designing and selling products using data compression or other technology that could render obsolete or adversely affect sales of [Stac's] products." *Id.* at 1406 (alterations in original). The prospectus went on to warn:

> One developer of a compatible operating system has licensed a competitive data compression product for incorporation into the latest version of the [DOS] operating system. There can be no assurance that Microsoft ... will not incorporate a competitive data compression technology in their products or that such a technology will not emerge as an industry standard.

*Id.* (second alteration in original). The plaintiff alleged that the "no assurance" language was inadequate and that Stac committed fraud because it knew that Microsoft was going to come out with a competitive product, but masked this knowledge as a contingency. The Ninth Circuit rejected this argument and dismissed the complaint. Citing *In re Convergent Technologies,* the Court held that Stac's "no assurance" language adequately disclosed

the competitive risks and was not misleading. *Id.*

Finally, in *Zeid v. Kimberley,* 930 F.Supp. 431 (N.D.Cal.1996), the defendant company's reports stated that its financial results may vary significantly due to several factors. The reports also stated that due to its sales with large customers significant, fluctuations can arise from the cancellation of a small number of orders. Further, the reports contained warnings regarding the company's volume of sales at the end of each quarter, its inability to adjust spending in a timely manner, and the possibility of reduced prices. The plaintiffs argued that these warnings were nothing but generic statements and the reports should have contained specific disclosures of the adverse factors which were then negatively impacting the company's business.

> In other words, Plaintiffs argue that Firefox should not have stated that certain adverse factors may effect the financial statements, but rather it should have said they are effecting Firefox's business. Plaintiffs' argument is absurd. Defendants' warnings regarding potential adverse factors are not actionable as a matter of law.

*Id.* at 437. The Court dismissed the lawsuit.

▆▆▆ Reading these cases together, the rule in this Circuit appears to be as follows: where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies.

As for Plaintiffs allegations that Defendants misrepresented WDC's ability to smoothly transition to MR technology, WDC's financial disclosures overflow with specific risk factors, as illustrated above. Thus, *Huddleston* is easily distinguished,

10. Although *In re Convergent Technologies* was a summary judgment case, the principles of law it announces are relevant to a motion to dismiss.

as it was in *In re Convergent Technologies* and *In re Stac.* Furthermore, WDC's disclosures contain the same "no assurance" language that the Ninth Circuit sanctioned in *In re Convergent Technologies* and *In re Stac.* The Court, therefore, concludes that these disclosures bespeak caution. Given that these numerous cautionary statements were made known to the market throughout the entire Class Period, Plaintiffs' fraud on the market theory must fail.

This analysis equally applies to Plaintiffs' argument regarding obsolescence of WDC's TF line of products. WDC's public filings contained many statements throughout the Class Period disclosing the risk that price erosion and obsolescence may affect WDC's operation if its transition to MR was unsuccessful or untimely. *See supra* Part II.D.2. Moreover, WDC disclosed all of the hard data, such as profit margins and inventory changes, from which potential investors could draw their own conclusions about WDC's financial health and future prospects. *See In re Verifone Securities Litigation* 784 F.Supp. 1471, 1481 (N.D.Cal.1992) ("Shareholders and potential investors are most in need of 'hard' information, such as sales and profit data, because such information is in the exclusive control of the corporation."), *aff'd*, 11 F.3d 865 (9th Cir.1993). The market, aware of these facts and disclosed risks, priced WDC stock accordingly. The market was not defrauded.

### F. Scienter

Finally, Defendants argue that Plaintiffs have not plead facts that give rise to a strong inference of scienter as required by the PSLRA. Under the Second Circuit standard, "[t]he requisite 'strong inference'

of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).[11]

#### 1. Motive and Opportunity

Plaintiffs maintain that they have met the Second Circuit's "motive and opportunity" standard for pleading a strong inference of scienter. The CAC alleges four motives for Defendants to commit securities fraud: (1) to protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (2) to reap the benefits of munificent incentive compensation plans that were tied to WDC's reported earnings and stock price; (3) to raise the price of WDC stock to prevent a takeover; and (4) to enhance the value of their personal holdings of WDC stock, allowing them to sell their shares at a substantial profit. (CAC ¶ 166).

Standing by themselves, the first three motives are insufficient as a matter of law. Similar motives were presented in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), and rejected by the Second Circuit:

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."

---

11. There has been significant debate among district courts as to whether Congress intended to codify the Second Circuit's standard, or strengthen it by disallowing "motive and opportunity" pleading. *Compare Novak v. Kasaks*, 997 F.Supp. 425, 429–30 (S.D.N.Y.1998) and *In re Silicon Graphics*, 970 F.Supp. at 756 *with Rehm v. Eagle Finance Corp.*, 954

F.Supp. 1246, 1252–53 (N.D.Ill.1997) and *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1310 (C.D.Cal.1996). However, as the CAC does not even meet the Second Circuit's standard, it is irrelevant whether the PSLRA established a higher pleading bar.

*Id.* at 54; *see also Shields,* 25 F.3d at 1130 (defendants' alleged motive of protecting their executive positions and the compensation and prestige they enjoy thereby insufficient to show strong inference of scienter); *Marksman Partners v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1312 (C.D.Cal.1996) (same).

■■■ The fourth alleged motive—to profit through sales of their personal holdings of WDC stock at artificially inflated prices—may, under certain circumstances, raise a strong inference of scienter. Upon reviewing numerous district court cases applying the PSLRA, the general rule is that such sales must be unusual when compared to prior trading practices in order to raise a strong inference of scienter. *See, e.g., Wenger v. Lumisys, Inc.,* No. C–97–20609, 1998 WL 199082, at *17 (N.D.Cal. March 31, 1998); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1352 (S.D.Cal. 1998); *In re Glenayre Technologies, Inc. Securities Litigation,* 982 F.Supp. 294, 299–300 (S.D.N.Y.1997); *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1254 (N.D.Ill.1997). These cases are in accord with Second Circuit precedent. *See Acito,* 47 F.3d at 54 (sales must be "unusual" to permit inference of bad faith and scienter). Some courts has even held that under the PSLRA, sales alone—even large sales—must be accompanied by negative internal reports in order to raise a strong inference

of scienter. *See In re Silicon Graphics,* 970 F.Supp. at 768; *Wenger,* 1998 WL 199082, at *17 (citing *In re Silicon Graphics* ).

The CAC includes a table displaying the stock sales executed by the individual Defendants during the Class Period. (*See* CAC ¶ 167).[12] Plaintiffs argue that these sales raise a strong inference of scienter. Defendants respond that if one looks at both stocks and exercisable options, Defendants actually increased their holdings during the Class Period.[13] *In re Silicon Graphics* addressed this issue:

> Exercisable options, not actual stock holdings, represent the owner's trading potential; by limiting their allegations to stock shares, plaintiffs artificially inflate defendants' activities. The differences between vested options and stock shares noted by plaintiffs—transfer and voting rights and dividends—are irrelevant for purposes of this analysis.

*Id.* at 768 n. 13. In response, Plaintiffs argue that the options were received as bonuses pursuant to the incentive compensation plan, and thus should not be considered. For the reasons discussed below, even if the Court ignores Defendants' exercisable options holdings, their stock sales do not raise a strong inference of scienter.

■■■ As stated above, the stock sales must be unusual in order to raise a strong

---

**12.** The table in the CAC is misleading in two ways. First, some of the prices listed in the table are the actual prices of WDC stock at the time the trade occurred, while others are adjusted for the two-for-one split that WDC declared in May of 1997. Thus, sale prices are not readily comparable. Furthermore, when sale prices are compared to the peak stock price of 53 ¼ that occurred on August 25, 1997, the transactions that are not split-adjusted display artificially high prices that should be halved. As the Court has taken judicial notice of WDC's stock price during the Class Period, the Court will take these errors into account.

Second, the table contains sales by the five named individual Defendants, as well as eight other individuals that are not named as defendants by the CAC. It is unclear to the Court why Plaintiffs included sales by unnamed in-

siders. Their transactions are irrelevant to alleging scienter against the five named Defendants. "In evaluating defendants' scienter, the [PSLRA] requires the Court to consider each defendant's sales separately." *In re Silicon Graphics,* 970 F.Supp. at 767; *see also* 15 U.S.C. § 78u–4(b)(2) (language of statute requires proof that "the defendant" acted with the required state of mind).

**13.** In making this argument, Defendants refer to the Form 4s filed by Defendants as required by the SEC. On these Form 4s, Defendants must report all trades in stocks and options. Because Plaintiffs must have based their allegations on these documents, they are properly before the Court on a motion to dismiss. The Court has already taken judicial notice of these filings.

inference of scienter. Neither party, however, addresses Defendants' trading activities prior to the Class Period. Because selling stock does not per se raise a strong inference of scienter, it is the Plaintiffs' burden to allege in the CAC that the trading was unusual. *In re Glenayre Technologies,* 982 F.Supp. at 299–300 (" 'While unusual insider trading activity during the class period may permit an inference of bad faith and scienter,' plaintiffs bear the burden of showing that any such sales are in fact unusual.") (quoting *Acito,* 47 F.3d at 54). Plaintiffs have not met their burden, for they have provided no information about Defendants' trading activities before the Class Period that may be compared with the sales during the Class Period.

■ The Ninth Circuit has held that insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter. *In re Apple Computer,* 886 F.2d at 1117. Plaintiffs argue that Defendants' sales came in three "waves" following upbeat earnings reports for the fourth quarter of 1996 (July 1996), the first quarter of 1997 (January 1997), and the fourth quarter of 1997 (July 1997). (CAC ¶¶ 168–170). Plaintiffs' allegation is misleading. The selling that occurred in July and August of 1997—the "third wave"—involved *non-defendants* that Plaintiffs, for whatever reason, decided to include in the stock table in the CAC. *See supra* note 12. As for the selling by named parties, Defendants have two responses.

First, Defendants point to Rule 10b–5's prohibition against insider trading. Specifically, insiders may not trade on material, non-public information. *See United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 2202, 138 L.Ed.2d 724 (1997) (corporate insiders must disclose material information or abstain from trading). A company's earnings are clearly material information. Defendants' selling occurred after WDC released its quarterly earnings results. Had Defendants sold stock shortly before WDC released these results, they would have violated Rule 10b–

5's prohibition against insider trading. That Defendants suspended their trading until after the earnings information had been disseminated to the investing public is simply evidence of Defendants' compliance with federal securities laws.

Second, and more important, Defendants point out that WDC stock peaked at 53 ¼ on August 25, 1997 and the first negative earnings announcement was released on September 29, 1997. However, the last sale of stock for each Defendant occurred between seven and ten months prior to the announcement:

Haggerty—10 months (12/6/96)

Nussbaum—8.5 months (1/15/97)

Braun—8.5 months (1/16/97)

Schafer—8 months (1/23/97)

Williams—7 months (2/21/97)

(CAC ¶ 167). Furthermore, most of these sales occurred at prices from the high teens to the mid–30s (as adjusted for the two-for-one stock split declared on May 2, 1997)—far from the high of 53 1/4. "Those cases basing a finding of bad faith on insider trades have involved trades in amounts dramatically out of line with prior trading practices at times calculated to *maximize personal benefit* from undisclosed inside information." *In re Apple Computer,* 886 F.2d at 1117 (emphasis added). Plaintiffs' argument that Defendants' motive was to sell their shares at artificially high prices is contradicted by the fact that Defendants did not sell any of their stock as the price climbed higher toward its peak of 53 1/4. Yet, they still had substantial holdings in both stocks and options. (*See* Exhs. 25–29). Given the timing of these sales and the prices at which they occurred, the transactions are not suspicious and do not raise a strong inference of scienter.

### 2. Strong Circumstantial Evidence of Conscious Misbehavior

Plaintiffs also believe that the CAC alleges facts that constitute strong circumstantial evidence of conscious misbehavior

or recklessness. The Court disagrees. Throughout the entire CAC, Plaintiffs allege a misrepresentation, and then make a conclusory statement that Defendants knew or should have known that the statement was false and misleading. As demonstrated throughout this Order, Plaintiffs provide no facts that would substantiate these bald allegations.

### G. Dismissal with Prejudice

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

Between December 12, 1997 and February 24, 1998, eight complaints and one amended complaint were filed against Defendants. On April 6, 1998, the Court consolidated the eights cases, appointed the Plevy class as the lead plaintiffs' class, and appointed Gary Weinstein as the lead plaintiffs' counsel. On April 29, 1998, lead counsel filed the CAC. Lead counsel has informed the Court that he conducted an investigation prior to filing the initial Plevy complaint, and conducted further investigations before filing the CAC.

The Court's dismissal of the CAC is based upon Plaintiffs' failure to provide specific facts that would indicate that Defendants' statements were false when made and that would give rise to a strong inference of scienter to defraud. At the hearing on Defendants' motion to dismiss, the Court asked Plaintiffs' lead counsel if he was aware of any other facts in support of Plaintiffs' allegations that were not included in the CAC. Lead counsel responded that he was aware of no such facts. Furthermore, the vast majority of Plaintiffs' alleged misrepresentations and omissions are rebutted by WDC's public filings. These filings would no doubt be considered in future amended complaints.

Accordingly, the Court concludes that Plaintiffs are unable to cure the deficiencies in the CAC that resulted in its dismissal.

### III. CONCLUSION

For all of the above reasons, the Court hereby DISMISSES Plaintiffs' Consolidated Amended Complaint WITH PREJUDICE.

IT IS SO ORDERED.